**In re Gladys B. EISELE, Debtor.**

**Gladys B. EISELE, Plaintiff,**

**v.**

**John HOLLOWAY, trading as Holloway Realty, Defendant.**

**Bankruptcy No. 88–03168 JKF.**
**Adv. No. 90–0066 JKF.**

United States Bankruptcy Court,
W.D. Pennsylvania.

April 17, 1991.

Gary W. Short, Pittsburgh, Pa., for Gladys B. Eisele.

K. Lawrence Kemp, Kemp and Kemp, New Kensington, Pa., for John Holloway.

## MEMORANDUM OPINION

JUDITH K. FITZGERALD, Bankruptcy Judge.

The core matter before the Court is the complaint of Gladys B. Eisele (hereafter "Debtor") objecting to the claim of John Holloway, trading as Holloway Realty (hereafter "Holloway") for real estate commissions and, in trespass and assumpsit, seeking recompense for all losses incurred by Debtor as the result of Holloway's conduct.[1] Holloway's counterclaim seeks payment of the commission as a Chapter 11 administrative expense.

### Facts

From the stipulations and evidence presented at trial, we find: The Debtor was the owner of a farm in Indiana Township, Allegheny County, Pennsylvania, consisting of approximately 122 acres. Holloway approached the Debtor in late December, 1985, or early January, 1986, to inquire whether the Debtor would consider selling her farm. On or about January 18, 1986, the Debtor entered into three separate listing agreements with Holloway to market the farm, each of which provided him a ten percent commission on the sale price. The first listed for sale the north half of the farm, consisting of 59.5 acres, more or less (Parcel A). The second listed the southern portion of the farm, consisting of approximately 59.5 acres (Parcel B), and the third listed ten acres located along the western side of the farm (Parcel C).

Sandra Goldsmith, an agent for Northwood Realty Company (hereafter "North-

1. This adversary proceeding was consolidated with Debtor's objection to the claim of Northwood Realty Company and an adversary filed by Debtor against Northwood and one of its agents. Both matters were settled. *See* Motion No. 90–0743–M (Objection to Claim of Northwood Realty Company) and Adversary No. 90–0216 (Complaint in Tort and Trespass against Northwood Realty Company and real estate agent Sandra Goldsmith).

wood"), contacted Holloway in April, 1986, and sought his approval for Northwood to co-broker the farm. Holloway consented. The co-broker agreement, to which Debtor was not a party, required Northwood to present any offers through Holloway, and entitled Northwood to fifty percent of all fees earned by Holloway under his listing agreements with the Debtor if Northwood procured the buyer. The listing agreements between the Debtor and Holloway obligated the Debtor to pay the full commission to Holloway regardless of which broker procured the buyer.

The parties further stipulated that Northwood showed the farm in April, 1986, to the Rosenblooms in the presence of Holloway and the Debtor. On April 30, 1986, the Rosenblooms, through Northwood and Holloway, presented an offer to the Debtor but she rejected it. During the first week of May, 1986, Holloway showed the farm to Jonathan and Beth Hall (hereafter Halls). On or about May 8, 1986, the Halls made a written offer to purchase the farm which was rejected by the Debtor. Through the end of that month, Holloway and Jonathan Hall worked on another offer that they hoped would be acceptable to the Debtor. Holloway informed Northwood of the Halls' interest in buying the farm.

Without notifying Holloway, Northwood presented Debtor with a second purchase offer from the Rosenblooms. On May 30, 1986, the Debtor accepted it and signed an agreement of sale (hereafter "the Rosenbloom Agreement.") *See* Exhibit 4. The Rosenbloom Agreement provided that the Rosenblooms would pay Debtor $102,-850.00 for Parcel A and gave them options to purchase two additional parcels: Parcel B for $188,700.00 if the option was exercised during the six months after the closing on the sale of Parcel A and Parcel C for $150,000.00 if the option was exercised during the year subsequent to the closing on Parcel A. A condition to the exercise of the option on Parcel B was that the parties had to agree on the location of a right of way over Parcel B to Parcel A. The sales agreement obligated the Rosenblooms to "indemnify" Debtor for fifty percent of any real estate commission incurred by her on the sale of Parcels B or C. The total purchase price of the farm if both options were exercised was $441,550.00. Paragraph 16 of the Rosenbloom Agreement contained a modified time of the essence clause which read:

If the full performance of this Agreement is not completed by the date set forth in paragraph 7,[2] either party shall have the right after that date to declare time to be of the essence of this Agreement by giving written notice to the other party. Such notice shall contain a declaration that time is of the essence and shall fix the time, date and place of final settlement, which date may not be sooner than fifteen (15) days nor later than thirty (30) days following the effective date of giving such notice.

When he learned of the Rosenbloom Agreement, Holloway became angry that Northwood had bypassed him in dealing with Debtor. On or before June 1, 1986, Holloway informed Jonathan Hall of the signing of the Rosenbloom Agreement. Subsequently, by letter dated July 7, 1986, Holloway wrote the following to the Halls: "The [Rosenbloom Agreement] has not closed and I don't think it ever will. ...I will keep you up to date relative to any developments in this matter. Let's keep our fingers crossed." Exhibit 5. The letter also informed the Halls that Holloway had written to Keith West, who was Debtor's attorney at that time, recommending the reopening of negotiations with the Halls. *See* Exhibit 6.

By letter of the same date to West, Holloway, referring to the Halls as "my clients," urged that the time of essence clause "be instituted and force Rosenblooms' [sic] to close within 15 days from the time of notice." Exhibit 6. At the same time, Holloway was encouraging Debtor to invoke the clause through her attorney. He told the Debtor that doing so would "kill" the sales agreement. On October 15, 1986, Debtor telephoned West and instructed him to send a letter implement-

---

**2.** That date was June 30, 1986.

ing the clause. She did not ask for, and he did not volunteer, information on either the meaning of the clause or the ramifications of invoking it. West did tell her that she "could be sued" if she persisted in this course of action. On or about the same day, Debtor informed Holloway that she had told her attorney to activate the clause. Because of Holloway's representations that invoking it would "kill" the Rosenbloom Agreement, Debtor believed that merely sending a letter would terminate her obligations to the Rosenblooms.

On or about October 20, 21, and 22, 1986, Holloway and Jonathan Hall prepared another offer for the farm. On October 23, 1986, eight days after Debtor contacted her attorney, Holloway presented Debtor with the new offer from the Halls (hereafter the Hall Agreement). He testified, and we accept, that before he took the Hall Agreement to Debtor, he called Debtor's attorney, who did not return the calls, but he made no other attempt to ascertain the status of the Rosenbloom Agreement. Thus, Holloway never learned whether all proceedings consummating the time of the essence clause had occurred.

Despite the insufficiency of his knowledge, on October 23, 1986, Holloway encouraged Debtor to sign the Hall Agreement immediately and represented to her that it had to be signed that night and closed within thirty (30) days or the offer would terminate. The agreement itself stated an acceptance date of October 24, 1986. Based on Holloway's assurance that sending the letter pursuant to the time of the essence clause rendered the Rosenbloom Agreement "dead," Debtor signed the Hall Agreement on October 23, 1986,[3] the evening Holloway presented it to her. Because the closing of the Rosenbloom Agreement was not scheduled until November, 1986, the significance of this misrepresentation by Holloway is not a substantial factor inasmuch as the Rosenbloom Agreement still was viable on October 24. However, we credit Debtor's version of the events and find that Holloway's high-pressure sales tactic, motivated by his undisclosed self-interest in obtaining a substantially higher commission, was the reason why Debtor signed the Hall Agreement at all, not just on October 23, 1986.

Under the Hall Agreement the entire farm was to be sold to the Halls for $436,000.00. On closing, Holloway would receive a commission of $43,600.00[4] which he would not be required to share with Northwood. This compares with the $22,077.50 Holloway would have received if all three parcels of the Rosenbloom Agreement closed.

Because Debtor had signed the Hall Agreement she did not appear at the Rosenbloom closing her attorney had scheduled on or about November 8, 1986, pursuant to the letter invoking the time of the essence clause. As a result, in December of 1986, the Rosenblooms filed a state court equity action for specific performance. The Halls petitioned to intervene over a year later and appealed the denial of their petition but later withdrew the appeal. On or about May 13, 1988, a week after the court approved a settlement and discontinuance of the Rosenbloom action, the Halls filed a separate complaint for specific performance of the October 23 sales agreement.

The settlement agreement between the Debtor and the Rosenblooms which was approved by the state court on May 6, 1988, modified the Rosenbloom Agreement by combining Parcels A and B, designating them Lot 1, and assigning a $282,050.00 price. The Rosenblooms retained their six-month option to purchase Parcel C, redesignated Lot 2, for $150,000.00 and obtained a

---

3. This was the day that Debtor's attorney sent the letter to the Rosenblooms invoking the time of the essence clause and scheduling a closing for November 1986. Debtor had not received a copy of the letter when she signed the agreement and believed that her attorney sent the letter immediately when she instructed him to do so on October 15.

4. The parties' stipulation of facts recited a commission under the Hall Agreement of $44,155.00 but the sales agreement itself stated $43,600.00. Exhibit 7. The $44,155.00 was the total commission due under the Rosenbloom Agreement, representing 10% of the sales price of $441,550.00.

right of first refusal on Lot 2 for two years. The decrease in sale price was caused by an uninsured fire loss of the second house on the property which occurred during the state court litigation.

On November 23, 1988, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code for the sole purpose of acquiring the right under 11 U.S.C. § 365 to reject the Hall Agreement in order to remove the cloud on the title created by it and the Halls' suit. On September 19, 1989, this Court entered an order authorizing the rejection of the Hall Agreement and the assumption of the second Rosenbloom Agreement. *In re Eisele*, Bankr. No. 88–03168, Motion No. 88–7329–M, 1989 WL 109090 (Bankr.W.D.Pa. Sept. 19, 1989). The Debtor and Rosenblooms closed on Lot 1 on December 12, 1989, for $282,050.00. On July 20, 1990, the parties closed on the remaining ten acres for $150,000.00.

### The Pleadings

Debtor objects to Holloway's claim for a commission. She asserts that he is not entitled to be paid because of his tortious conduct, including his interference with her performance of the first sales contract with the Rosenblooms and his material misrepresentations concerning the time of the essence clause. Holloway counterclaims for a real estate broker's commission of ten percent or $43,205.00 [5] which he asserts should be allowed as an administrative expense because the closing on the sale took place during the chapter 11.[6]

### (1) The Counterclaim

■ With respect to the counterclaim seeking administrative expense status, we note that Holloway never sought court authority for employment as a broker for the estate nor was an order entered at any time during the case approving him as such. Under the law of the Third Circuit, by which we are bound, Holloway's claim is not entitled to administrative expense status. *F/S Airlease II, Inc. v. Simon*, 844 F.2d 99 (3d Cir.1988). Moreover, there is nothing in the facts of this case which would entitle him to nunc pro tunc appointment, even if he should so move. We base this conclusion on the fact that he did no post-petition work and on our findings that his prepetition conduct in connection with the sale of Debtor's farm was outrageous, violative of law and unethical. Accordingly, payment of Holloway's claim as an administrative expense is out of the question. The counterclaim will be dismissed.

### (2) Debtor's Damages

■ At best, Holloway has an unsecured claim for prepetition services. We conclude Holloway's claim must be disallowed. We so determine on the basis of Holloway's egregious conduct which we find to be the catalyst for Debtor's legal problems, including this bankruptcy, and certain economic losses she has sustained as a result. That Debtor's sales agreement ever resulted in a closing occurred *despite* Holloway's actions, not because of them. We credit her testimony that she hired Holloway as her broker because he was skilled in real estate matters and she was not, that she trusted him and believed that he gave her correct and reliable advice. We recognize that Debtor is not entirely without blame for her state of affairs because she placed her reliance upon Holloway's erroneous representations rather than upon the language of the contracts she signed, but find that Holloway's negligence, affirmative misrepresentations and intentional interference with performance of an existing contract, of which he had actual knowledge, far exceed the negligible fault attributable to Debtor.

■ Debtor seeks actual damages consisting of attorneys' fees incurred in defense of the state court actions and the

---

5. The sum of $43,205.00 consists of ten percent of the sale price of Lot 1 ($28,205.00) and the same percentage of the price of Lot 2 as to which the Rosenblooms exercised their option ($15,000.00).

6. Holloway contends that he is entitled to a ten percent commission of the sale price under the Hall Agreement as well, although no sale resulted from this agreement. This claim is entirely without merit.

prosecution of her bankruptcy, monies paid to settle the Hall claim, lost interest earnings from the delay in closing the first Rosenbloom Agreement, and real estate tax liability she incurred due to the delay in closing.

Attorneys' fees were proven to be $3,258.59 for state court matters. An order was entered in the bankruptcy on October 30, 1990, approving fees and expenses for Debtor's counsel in the amount of $31,273.77 and another on April 9, 1991, for $4,949.96 in additional fees and expenses. Counsel estimates that if no appeal from this decision is taken, Debtor will incur $1,000.00 to $5,000.00 more in legal fees to conclude the case.

As part of the fiasco which has been this case, the Halls filed a million dollar claim, Debtor's objection to which was resolved by her agreement to pay them $10,000.00. Thus, Debtor's total liability to date resulting from Holloway's conduct is $49,481.72. Of that sum, Holloway's claim against the estate is for the entire commission of $43,205.00. However, Debtor's out-of-pocket share would have been only $26,745.00 under the terms of the settlement agreement with the Rosenblooms.[7] The remainder would have been paid by the Rosenblooms and Debtor would not have lost the use of her money in the amount which the Rosenblooms would have contributed.

▮▮▮ Debtor also demands lost earnings in the form of interest which she would have received from the Rosenblooms on the note and mortgage they were to execute in her favor at closing and real estate taxes Debtor paid pending the sale of her property. We find that the lost interest payments as to Parcel A of the original agreement from November 8, 1986 (the originally scheduled closing date) through December 12, 1989 (the actual closing date), are a consequential damage of Holloway's misconduct and will direct Debtor's counsel to calculate the amount which will be included in the judgment we will enter against Holloway. Any lost interest earnings on sales of Parcels B and C are speculative inasmuch as nothing compelled the Rosenblooms to exercise their options to purchase and no closing ever was scheduled on those lots. Thus, only interest lost as to original Parcel A will be awarded. The taxes, however, we will not award against Holloway. First of all, the sales agreement divided the property into parcels and, before the closings, taxes were not allocated as to parcels. Moreover, Debtor continued to live in the house which is located on the premises, even after the actual closings, pursuant to a provision in the sales agreement authorizing same. She had the full use and enjoyment of her farm property during the delay in closing and bears the responsibility for the tax payment.

In light of Holloway's conduct and applicable law as discussed hereinafter, we conclude that judgment shall be awarded for Debtor in the amount of (a) $22,736.72 representing the difference between Debtor's current pecuniary loss from liability for attorney fees and litigation settlement costs and the amount she would have been out of pocket absent Holloway's conduct,[8] plus (b) the lost earnings by way of interest on the Rosenbloom note and mortgage as

---

7. The settlement agreement provided that:
   In addition to any other payments due at Closing, the Rosenblooms shall pay to Eisele one-half (½) of the real estate commission due on Parcel B ... or $8,960.00. In addition, in the event the Rosenblooms purchase the Adjacent Property (as hereinafter defined), the Rosenblooms shall indemnify Eisele for one-half (½) of the real estate commission payable by Eisele arising in any way pursuant to this Agreement, and related to the Adjacent Property pursuant to a certain Listing Agreement with Holloway Realty dated January 18, 1986. The Adjacent Property is Lot No. 2 in the Eisele Plan of Lots.

Thus, the Rosenblooms' share of the commission would have been $16,460.00, an amount payable over and above the sale price if Debtor incurred a liability for a commission on Parcel 1. The original Rosenbloom Agreement provided that the Rosenblooms would indemnify Debtor for any real estate commission on Parcels B and C.

8. We base our calculations as to the commission on the second Rosenbloom Agreement because Holloway's conduct was the cause of the first not closing and it was the second agreement which actually closed.

to original Parcel A which Debtor's attorney shall calculate and submit to the Court. Debtor's counsel also will be permitted to request reasonable supplemental fees which, if and when approved, will be charged to Holloway.

██ Debtor also seeks punitive damages but none will be awarded. We find that the restitutionary recovery we will award Debtor so that she will incur no pecuniary loss, coupled with the denial of Holloway's commission, is sufficient monetary sanction. His conduct was egregious enough, however, that we will refer this matter to the Pennsylvania Real Estate Commission for appropriate investigation.

*Legal Analysis*

(1) *The Objection to Claim and the Trespass and Assumpsit Action*

██ Pennsylvania recognizes the tort of tortious interference with contracts, *Ebasco Services, Inc. v. Pa. Power & Light Co.,* 402 F.Supp. 421, 452 (E.D.Pa.1975), and follows the Restatement (Second) of Torts (1979) regarding various types of contract interference. *See, e.g., Adler, Barish, Daniels, Levin and Creskoff v. Epstein,* 482 Pa. 416, 429–31, 393 A.2d 1175, 1183–85 (1978), *cert. denied,* 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979) (re § 766 of the Restatement (Second) of Torts); *Yaindl v. Ingersoll–Rand Co.,* 281 Pa.Superior Ct. 560, 581 n. 11, 422 A.2d 611, 622 n. 11 (1980). *See also United States Healthcare, Inc. v. Blue Cross,* 898 F.2d 914, 925 (3d Cir.1990); *Nathanson v. The Medical College of Pennsylvania,* 926 F.2d 1368 at 1387–92 (3d Cir.1991).

The elements of an intentional interference with another's performance of his own contract are set forth in § 766A of the Restatement (Second) of Torts as follows:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

The comments to this section indicate that the tort covers conduct which must be both intentional and improper. Section 767 of the Restatement (Second) sets forth the factors to be considered in determining whether the conduct at issue was "improper." Section 767 states:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

In light of these factors, the evidence established that Holloway intentionally and improperly interfered with Debtor's contract with the Rosenblooms.

Holloway, as a real estate broker and agent, was in a better position than was Debtor to know the meaning of the time of essence clause and, in fact, had demonstrated his understanding of it months before he told Debtor it would nullify the Rosenbloom Agreement. In his letter of July 7, 1986, to Debtor's attorney Holloway wrote: "I strongly recommend that Clause # 16, 'Modified Time of Essence Clause,' be instituted and force Rosenblooms' [sic] to close within 15 days from the time of notice." Exhibit 6. Although he admitted having told Debtor that invoking the clause would kill the contract, Holloway testified that Debtor's version of events was unreliable because his letter of July 7, 1986, to Keith West established his understanding of the clause's meaning and operation. We observed both witnesses, however, and we accord to Debtor's testimony all the weight of credibility on this issue. That Holloway

knew the clause's meaning does not establish that he presented correct information to Debtor and we find that he did not correctly inform her, despite his actual knowledge of the true meaning and effect of the clause. Holloway prepared the Rosenbloom agreement and knew that it required a closing fifteen to thirty (15–30) days after the clause was invoked but he allowed only eight days to elapse between the time Debtor told him she had contacted her attorney about the matter (October 15) and the date he presented Debtor with the Hall Agreement (October 23). His attempts to verify the status of the Rosenbloom Agreement with her attorney were unsuccessful and insufficient. His action was unreasonable for an experienced broker, when his only attempt to determine the status of the Rosenbloom Agreement was to call but never speak with Debtor's attorney. At a minimum he should have made inquiry of Debtor as to specific facts and dates in order to ascertain the status of the Rosenbloom Agreement. He failed even to ask Debtor whether a closing had been scheduled. Her negative answer to such an inquiry would have apprised him of the "live" status of the Rosenbloom Agreement. *See* Exhibit 6. In these respects he was negligent.

▇▇▇ Violations of statutes also constitute improper conduct under § 767. We find that Holloway violated the Real Estate Licensing and Registration Act, 63 P.S. § 455.101 *et seq.* (as amended in 1984) (RELRA), which imposes a standard of conduct upon real estate brokers for the public's protection. His actions were the proximate and immediate cause of Debtor's failure to perform the first Rosenbloom Agreement which resulted in her pecuniary loss. RELRA [9] prohibits the following acts, among others:

(1) Making any substantial misrepresentation....

(11) Inducing any party to a contract, sale or lease to break such contract for the purpose of substitution in lieu thereof of a new contract, where such substitution is motivated by the personal gain of the licensee....

(20) Any conduct in a real estate transaction which demonstrates bad faith, dishonesty, untrustworthiness, or incompetency.

*Id.* at § 455.604(a).

▇▇▇ Holloway was Debtor's agent and, as such, owed her a fiduciary duty to act with the "utmost good faith." *Raisch v. Cook,* 306 Pa. 208, 159 A. 170 (1932); *Greene v. Hawtof,* 87 Pa.Super. 479 (1926); *Henderson v. Sonneborn,* 30 Pa.Super. 182 (1906).[10] As a fiduciary he was required to make known to his principal all important matters which may have affected the transaction. *Allegheny By–Product Co. v. J.H. Hillman & Sons Co.,* 275 Pa. 191, 118 A. 900 (1922). His failure to carry out his duties deprive him of entitlement to any commission. *Greene v. Hawtof, supra.* "Full disclosure, communication and a detailed explanation of the terms of the agreement of sale are little enough to be expected." *Perry v. Pa. State Real Estate Commission,* 17 Pa.Cmwlth. 581, 585, 333 A.2d 216, 218 (1975). *See also* Murray, *The*

---

**9.** We note that the Real Estate Licensing and Registration Act, 63 P.S. § 455.101 et seq. (as amended 1984), provides for suspension or revocation of a license of one who fails "to specify a definite termination date that is not subject to prior notice, in any listing contract." *Id.* at § 455.604(a)(10). The three listing agreements between Debtor and Holloway run afoul of this provision in that they provide for termination "at any time after 30 days have elapsed from the commencement date of [each] agreement by the Owner giving ten (10) days' notice in writing...." Exhibits 1, 2, 3.

**10.** Anticipating an argument that, because the listing agreement between Debtor and Holloway was terminated before the first Rosenbloom offer was accepted by Debtor, the agency relationship had ended before the acts complained of occurred, we note that, to all appearances, the parties continued their relationship unchanged and without disjunction. Furthermore, it is axiomatic that the formal expiration of a contract term does not always mean the end of the relationship between parties. In this case, Holloway continued to market Debtor's property, even procuring an offer which he induced Debtor to accept at a time when he knew the property was subject to an outstanding sales agreement. In addition, both the Rosenbloom and Hall sales agreements provide that Holloway is Debtor's agent, not either buyer's agent. *See, e.g.,* Exhibits 4 & 7. Holloway is estopped from asserting to the contrary.

*Real Estate Broker and the Buyer: Negligence and the Duty to Investigate*, 32 VILLANOVA L.REV. 939, nn. 6, 8, 25, 26, 39, 40, 47 and accompanying text (discussing relationship between broker and seller).

Holloway, who induced Debtor to utilize the time of the essence clause, had an affirmative and fiduciary obligation to explain to Debtor the ramifications of the clause. He not only failed to do so but he intentionally misrepresented its meaning, operation and effect in order to persuade Debtor to invoke the clause and extricate herself from the Rosenbloom Agreement. His conduct is all the more egregious because it was at his instigation that the time of the essence clause was invoked. Holloway's sole motive was to obtain a sales agreement with the Halls which would provide him with almost twice the commission he would have received under the Rosenbloom Agreement.[11] Thus, Holloway's violation of RELRA is itself a sufficient basis upon which to find his conduct improper.

Debtor established that she had a contract with the Rosenblooms, that Holloway intended to and did cause her to breach it, and that in so doing Holloway acted improperly within the meaning of § 766A and 767 of the Restatement (Second) of Torts. His conduct violated his fiduciary duties to Debtor as her broker and was motivated by his own self-interest. It was intended to achieve the result which ensued: i.e., to cause Debtor not to perform with the Rosenblooms and to enter into another sales agreement with the Halls. Societal interest and public policy are harmed when a fiduciary behaves in a manner which is calculated to advance his self-interest at the expense of his principal. Thus, Holloway's conduct was improper. As a result, Holloway is liable for Debtor's pecuniary loss.

### (2) *Debtor's Contributory Negligence*

In a breach of duty/negligence analysis we must note that a recovery may

be denied for damages which could have been avoided if the plaintiff had behaved in a reasonable manner. PROSSER & KEETON ON THE LAW OF TORTS, § 11:65, page 459 (5th ed. 1984). On the other hand a plaintiff's contributory negligence is not extended to situations where the defendant committed an intentional tort or acted in a wilful, wanton or reckless manner. *Id.* at § 11:65, page 462. The distinction is based on the difference in kind and degree of fault and attendant social considerations with the result that contributory negligence will not bar a plaintiff's recovery in circumstances where the defendant behaved in an opprobrious manner.

If Debtor had read the original Rosenbloom Agreement she would have seen that a closing had to be set between fifteen and thirty days after the time of the essence clause was instituted. *See* Exhibit 4, ¶ 16. However, the operative language is buried in the midst of standard pre-printed paragraphs in the agreement of sale and two pages of "Additional Provisions" and there is nothing in the form itself to highlight this clause. Although Debtor has an obligation to inform herself of the provisions of her contracts, we find that, under the facts of this case, her reliance on Holloway's misrepresentations was not unreasonable, particularly because Holloway not only knew the meaning and implications of the time of the essence clause but had the fiduciary obligation to explain them to Debtor. *See Allegheny By–Product Co. v. H.H. Hillman and Sons Co.*, 275 Pa. 191, 118 A. 900 (1922). Case law imposes the highest standard of conduct upon someone in Holloway's position of trust and confidence. *See, e.g., Perry v. Pa. State Real Estate Comm'n*, 17 Pa.Cmwlth. at 585, 333 A.2d at 218. Holloway's conduct was proven to be a clear violation of fiduciary duty via intentional misrepresentation. A more transparent scheme to obtain a greater commission would be hard to find. We

---

**11.** Throughout this bankruptcy Holloway has insisted that the Hall Agreement was better for Debtor because it carried a higher sale price without the risks of options and that he only had Debtor's interests at heart. In fact, the sale price under the Hall Agreement was $5,550.00 lower than that under the first Rosenbloom Agreement. The major differences were in the existence of options and in who would receive the commission but the agreements are not so disparate that we credit this testimony.

conclude that Holloway's conduct was precisely the type of abuse that RELRA and its predecessor, the Real Estate Brokers License Act of 1929, 63 P.S. § 431, et seq., were intended to regulate in the realization of "the privileged position of trust and confidence enjoyed by a broker." *Perry, supra,* 333 A.2d at 218. We find that Holloway's misconduct was intentional and negates any effect of Debtor's minimal contributory negligence. Accordingly, Debtor's claim to damages survives the negligence analysis.

### Conclusion

Debtor alleged and proved that Holloway breached his fiduciary duty to her, negligently performed the agency contract between them, and intentionally induced her not to perform her contract with the Rosenblooms in order to achieve a sale to a buyer with whom Northwood had no connection, thereby relieving Holloway of any obligation to share his commission. Debtor established that Holloway intentionally and negligently misrepresented to her that merely by invoking the time of the essence clause the Rosenbloom Agreement would be "dead". His misconduct resulted in the very act he sought, i.e., to have Debtor sign the Hall Agreement. The consequent cloud on title was the issue in all of Debtor's legal battles. We find that Holloway's conduct was in derogation of his fiduciary obligation to Debtor and was motivated by his own self-interest in order to obtain a commission, via the Hall Agreement, which he would not have to share with Northwood.

We further conclude that Holloway's misconduct, taken as a whole, was intentional and wilful. It was calculated to achieve personal gain in violation of statutes and case law. As a result, judgment will be entered in favor of Debtor and against Holloway on both her complaint and on his counterclaim after receipt of the interest calculation as directed herein.

An appropriate Order shall be entered.