In re Gladys B. **EISELE,** Debtor.

Gladys B. **EISELE, Plaintiff/appellee, Cross-appellant,**

v.

John **HOLLOWAY, trading as Holloway Realty, Defendant/appellant, Cross-appellee.**

Civ. A. Nos. 91–916, 91–1123.
Bankruptcy No. 88–3168 JKF.
Adv. No. 90–66.

United States District Court,
W.D. Pennsylvania.

Oct. 9, 1991.

Gary W. Short, Pittsburgh, Pa., for plaintiff/appellee, cross-appellant.

K. Lawrence Kemp, New Kensington, Pa., for defendant/appellant, cross-appellee.

## MEMORANDUM OPINION

BLOCH, District Judge.

Presently before the Court is an appeal filed by defendant John Holloway, and cross-appeal filed by debtor/plaintiff, Gladys B. Eisele, from a final judgment of the United States Bankruptcy Court for the Western District of Pennsylvania, Judge Judith K. Fitzgerald, entered April 29, 1991, and from the Memorandum Opinion and Order dated April 17, 1991, which preceded it.[1] For the reasons stated below, the judgment and order of the Bankruptcy Court is affirmed in part and vacated and remanded in part.

### I. Facts

On January 18, 1986, Eisele entered into three separate listing agreements with Holloway to market her farm in Allegheny County, Pennsylvania. The listings were for the sale of three parcels of Eisele's land, parcel A, B, and C.

In April of 1986, Holloway consented to a co-broker agreement with Sandra Goldsmith, an agent for another realty agency, Northwood Realty Company (Northwood), for the sale of Eisele's three parcels. The co-broker agreement required Goldsmith to present any offers through Holloway, and entitled Holloway to fifty percent of all fees earned if Northwood procured the buyer.

On May 30, 1986, Eisele signed an agreement of sale presented to her by Goldsmith, without Holloway's knowledge, whereby Eisele agreed to sell Parcel A to the Rosenblooms (Rosenbloom Agreement). The Rosenbloom Agreement provided that the Rosenblooms would pay Eisele $102,-850 for parcel A and gave them an option to purchase parcels B and C within one year. The agreement obligated the Rosenblooms to "indemnify" Eisele for fifty percent of any real estate commission incurred by her on the sales of parcels B or C. The Rosenbloom Agreement also contained a "time of the essence clause," which read:

If the full performance of this Agreement is not completed by the date set forth in paragraph 7,[2] either party shall have the right after that date to declare time to be of the essence of this Agreement by giving written notice to the other party. Such notice shall contain a declaration that time is of the essence and shall fix the time, date and place of final settlement, which date may not be sooner than fifteen (15) days nor later than thirty (30) days following the effective date of giving such notice.

Soon after discovering the sales agreement, defendant Holloway contacted Eisele's attorney, Keith West, urging that the time of essence clause "be instituted and force Rosenblooms' [sic] to close within 15 days from the time of notice." *In re Eisele*, 125 B.R. 922, 925 (Bkrptcy.W.D.Pa. 1991). At the same time, Holloway was also encouraging Eisele directly to invoke the clause. He told Eisele that doing so would "kill" the Rosenbloom Agreement. On October 15, 1986, Eisele telephoned West and instructed him to send a letter implementing the clause. Eisele told Holloway that day that she had told her attorney to implement the clause. In fact, West sent the time of the essence letter the following week, on October 23, 1986.

Eight days later (the same day West actually sent the time-of-the-essence letter), Holloway presented Eisele with an offer from the Halls (Hall Agreement). Holloway encouraged Eisele to sign the Hall Agreement immediately and represented to her that it had to be signed that night and

---

1. Defendant Holloway filed an appeal to Judge Fitzgerald's opinion and order on May 9, 1991. On May 20, 1991, Debtor/Plaintiff Eisele filed a notice of appeal to the same order and opinion. On July 25, 1991, this Court granted Eisele's Motion to Consolidate Appeal. Therefore, this Court is treating Eisele's appeal as a cross-appeal to the appeal of Holloway.

2. That date was June 30, 1986.

closed within thirty (30) days or the offer would terminate. The agreement itself stated an acceptance deadline of October 24, 1986, the next day. Under the Hall Agreement, the entire farm was to be sold to the Halls for $436,000. On closing, Holloway would be entitled to a commission of $43,600. This compares to $22,077.50 that Holloway would have received if all three parcels of the Rosenbloom Agreement closed. Eisele signed the Hall Agreement that night.

Eisele did not appear at the Rosenbloom closing on November 8, 1986. As a result, the Rosenblooms filed a state equity action for specific performance. On May 13, 1988, the court approved a settlement which modified the original Rosenbloom Agreement, decreasing the price due to an uninsured fire loss on the property. One week later, the Halls filed a separate complaint for specific performance of the October 23 sales agreement.

On November 23, 1988, Eisele filed a voluntary petition under Chapter 11 of the Bankruptcy Code exclusively to remove the cloud on the title created by the Halls' suit. On September 19, 1989, the Bankruptcy Court, Judge Fitzgerald, entered an order authorizing the rejection of the Hall Agreement and the assumption of the second Rosenbloom Agreement. *In re Eisele*, Bankr. No. 88–03168, Motion No. 88–7329–M, 1989 WL 109090 (Bankr.W.D.Pa. Sept. 19, 1989). Eisele and the Rosenblooms closed on Lot 1 on December 12, 1989, for $282,050. On July 20, 1990, the parties closed on the remaining land for $150,000.

## II. Action before the Bankruptcy Court

On April 17, 1991, Judge Judith K. Fitzgerald entered her Memorandum Opinion. Judge Fitzgerald found:

Debtor alleged and proved that Holloway breached his fiduciary duty to her, negligently performed the agency contract between them, and intentionally induced her not to perform her contract with the Rosenblooms in order to achieve a sale to a buyer with whom Northwood had no connection, thereby relieving Holloway of any obligation to share his com-mission. Debtor established that Holloway intentionally and negligently misrepresented to her that merely invoking the time of the essence clause the Rosenbloom Agreement would be "dead." His misconduct resulted in the very act he sought, i.e., to have Debtor sign the Hall Agreement. The consequent cloud on title was the issue in all of Debtor's legal battles.

*In re Eisele*, 125 B.R. at 932.

As a result, Judge Fitzgerald ordered total judgment in favor of Eisele in the amount of $41,790.74, comprised of: $22,-736.72, "representing the difference between Debtor's current pecuniary loss from liability for attorney's fees and litigation settlement costs and the amount she would have been out of pocket absent Holloway's conduct," plus $19,054.02, representing the lost interest earnings on the Rosenbloom note and mortgage as to original Parcel A. *In re Eisele*, 125 B.R. at 928.

Holloway's liability was premised on the tort of intentionally and improperly interfering with contracts. *See, e.g., Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 393 A.2d 1175 (1978). In addition to the finding by the Bankruptcy Court that Holloway's conduct constituted such a tort, the Court offered further substantiation. "Violations of statutes also constitute improper conduct under [this tort]. We find that Holloway violated the Real Estate Licensing and Registration Act, 63 P.S. § 455.101, *et seq.* (as amended in 1984) (RELRA), which imposes a standard of conduct upon real estate brokers for the public's protection." *In re Eisele*, 125 B.R. at 930.

Judge Fitzgerald dismissed Holloway's contributory negligence defense. Stating that "[w]e find that Holloway's misconduct was intentional and negates any effect of Debtor's minimal contributory negligence." *Id.* at 932.

Finally, the Court declined to award Eisele punitive damages. *Id.* at 929.

Holloway has appealed Judge Fitzgerald's ruling. Holloway asserts: (1) his behavior did not rise to the level of "wanton or gross negligence," (2) Eisele was con-

tributorily negligent, (3) the Halls' lawsuit represents an intervening and superseding cause, and, (4) Eisele has failed to prove that the expenses incurred were reasonably necessary.

Eisele's cross-appeal asserts that Judge Fitzgerald erred when she did not award Eisele punitive damages.

## III. Standard of review

■ It is well settled that this Court should apply a clearly erroneous standard to findings of fact, but conduct plenary review of legal conclusions. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1223–23 (3d Cir.1989). "[C]ourts apply a clearly erroneous standard to findings of basic and inferred fact." *Id.* at 1223. In contrast, an ultimate fact is "a legal concept with a factual component." *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 103 (3d Cir.1981). Such a fact "is usually expressed in the language of a standard enunciated by case-law or statute, *e.g.*, an actor's conduct was negligent...." *Id.* at 102. "When reviewing an ultimate finding, this Court must accept the trial court's finding of historical or narrative facts unless they are clearly erroneous, but it must exercise a plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *In re Sharon Steel*, 871 F.2d at 1223, *quoting Universal Minerals*, 669 F.2d at 103. The Bankruptcy Court's legal determinations receive no presumption of correctness. *In re Marcus Hook Development Park, Inc.*, 943 F.2d 261, 263–64 (3d Cir.1991).

In the instant case, Judge Fitzgerald provided a comprehensive account of the facts. *In re Eisele*, 125 B.R. at 924–927. After reviewing the record, including the transcript of the hearing before Judge Fitzgerald, October 9, 1990, this Court finds that Judge Fitzgerald's accounting of the facts were not clearly erroneous, and affirms them.

Specifically, this Court notes the following facts related to the motivation behind Eisele asking for the time-of-the-essence letter to be sent, and, her signing of the Hall Agreement, despite knowing that she had already signed an agreement with the Rosenblooms: Holloway told Eisele that sending the time-of-the-essence letter would "kill" the Rosenbloom Agreement, *In re Eisele*, 125 B.R. at 925; because of Holloway's misrepresentations that invoking it would "kill" the Rosenbloom Agreement, Eisele believed that merely sending a letter would terminate her obligations to the Rosenblooms, *id.* at 926; Holloway encouraged Eisele to sign the Hall Agreement immediately and represented to her that it had to be signed that night or the offer would terminate, *id.;* and, based on Holloway's assurances that sending the letter pursuant to the time of the essence clause rendered the Rosenbloom Agreement dead, Eisele signed the Hall Agreement, *id.*

Perhaps most importantly, Judge Fitzgerald found that "Holloway's high-pressure sales tactic, motivated by his undisclosed self-interest in obtaining a substantially higher commission, was the reason why Debtor signed the Hall Agreement...." *In re Eisele*, 125 B.R. at 926.

## IV. Holloway's appeal

■ Defendant Holloway is asking this Court to rule that "even if Holloway were negligent, his negligence was not wanton or gross." (Appellant's brief, at 3). Since the tortious conduct for which Holloway has been held liable is grounded in classifications of conduct that do not relate to "wanton or gross negligence," this Court finds that Holloway's claim is irrelevant, and this Court will not come to a conclusion as to whether Holloway's conduct rose to the level of "wanton or gross negligence."[3]

Holloway has been found to have committed tortious interference with an existing contractual relationship. The Pennsylvania Supreme Court has explicitly adopted

---

**3.** The wanton or gross negligence standard is also inapplicable to Eisele's cross-appeal regarding the imposition of punitive damages. *Martin*

*v. Johns–Manville Corp.*, 508 Pa. 154, 494 A.2d 1088, 1097 (1985).

the standard Restatement (Second) of Torts § 766 (1979) for determining the elements for this tort. *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1388 (3d Cir.1991); *Adler, Barish, supra.* The Restatement (Second) provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the third person's failure to perform the contract.

*Adler, Barish,* 393 A.2d at 1183.

In determining the propriety of the actor's conduct, the Court is guided by the following factors from the Restatement (Second) of Torts:

(a) The nature of the actor's conduct,

(b) The actor's motive,

(c) The interests of the other with which the actor's conduct interferes,

(d) The interests sought to be advanced by the actor,

(e) The proximity or remoteness of the actor's conduct to the interference, and,

(f) The relations between the parties.

*U.S. Healthcare v. Blue Cross of Gr. Philadelphia,* 898 F.2d 914, 925 (3d Cir.1990), *quoting Adler, Barish,* 393 A.2d at 1175.

■ Under the standard just stated, it is beyond dispute that Holloway tortiously interfered with Eisele's contract with the Rosenblooms. Holloway acted intentionally, with the distinct motive to garner a greater commission through a sale to the Halls. Holloway's actions interfered with Eisele's interest in conducting her affairs lawfully, that is, Eisele's interest in avoiding litigation. Holloway's interests were strictly for personal gain. Holloway's conduct was the *immediate* cause of Eisele breaching her contract with the Rosenblooms, and, finally, Holloway's relationship with Eisele was a "privileged position of trust and confidence enjoyed by a [real estate] broker." *Perry v. State Real Estate Commission,* 17 Pa.Cmwlth. 581, 333 A.2d 216, 218 (1975).

■ In addition, the Restatement (Second) of Torts provides that "[c]onduct specifically in violation of statutory provisions ... may for that reason make an interference [with another's contract] improper." § 767, Comment on Clause (a), at 31. In the instant case, Holloway's conduct falls squarely within the prohibited acts of the RELRA. Section 455.604(a) of the Act prohibits a broker from "[m]aking any substantial misrepresentation" and "[i]nducing any party to a contract ... to break such contract for the purpose of substituting in lieu thereof a new contract, where such substitution is motivated by the personal gain of the licensee." *Id.* at § 455.-604(a)(1), (11).

In *Wagner v. State Real Estate Commission,* 126 Pa.Cmwlth. 368, 559 A.2d 999 (1989), the Court affirmed an order of the State Real Estate Commission finding that a broker had violated the RELRA when the broker withheld information concerning liens encumbering property. In addition, the Court found that the broker assured the buyers that no title problems existed. *Id.* at 1001. The broker "did not inform the [buyers], first time buyers of real estate, that a title search was necessary to protect their interests[, and, finally, the broker] never explained an endorsement on the sales agreement which provided that the [buyers] would take whatever title [the seller] could give with no abatement in the purchase price." *Id.*

The instant case is no different than *Wagner.* "Full disclosure, communication and detailed explanation of the terms of the agreement of sale are little enough to be expected." *Perry,* 333 A.2d at 218. Holloway's misrepresentations to Eisele were intentional and deliberate. The Bankruptcy Court's determination that Holloway committed tortious interference with another's contract was correct and this Court affirms. Eisele is entitled to pecuniary damages that resulted from Holloway's conduct. *See Aiello v. Ed Saxe Real Estate, Inc.,* 508 Pa. 553, 499 A.2d 282, 284 (1985).

■ Holloway next requests that this Court find that Eisele was contributorily negligent, and, hence, "defendant is not answerable even if actually found guilty of negligence." (Appellant's brief, p. 6). There is no merit to Holloway's suggestion.

Holloway's reliance on *Westcoat v. Northwest Savings Association,* 378 Pa.Super. 295, 548 A.2d 619 (1988), is misleading. In *Westcoat,* plaintiffs brought an action for recovery of insurance coverage amounts for plaintiffs' injuries, alleging that they thought they were covered. Defendant insurance company asserted that they had sent letters informing plaintiffs that their application had been denied. The only question presented to the Court "was whether this information was actually received by the plaintiffs who denied having received such notifications." *Id.* 548 A.2d at 620. Once it was determined that they had received the information, they were held to be contributorily negligent and recovery was barred.

Relevant to the instant case is *Dougherty v. Pa. State Real Estate Commission,* 99 Pa.Cmwlth. 397, 513 A.2d 555 (1986). In *Dougherty,* the Court affirmed a finding of RELRA violation when the broker "did not give the Purchasers an opportunity to read the contract but instead explained to the Purchasers what was in the contract." *Id.* 513 A.2d at 556. The holding in *Dougherty* is consistent with Judge Fitzgerald's logic:

> If Debtor had read the original Rosenbloom Agreement she would have seen that a closing had to be set between fifteen and thirty days after the time of the essence clause was instituted.... However, the operative language is buried in the midst of standard pre-printed paragraphs in the agreement of sale and two pages of "Additional Provisions" and there is nothing in the form itself to highlight this clause.

*In re Eisele,* 125 B.R. at 931.

Indeed, the Pennsylvania courts have found an affirmative duty for a broker to explain provisions within land-sale contracts. *See Wagner v. State Real Estate*

*Commission, supra,* 559 A.2d at 1002–04. Case law imposes the highest standard of conduct and expects "full disclosure" from someone in Holloway's position of trust and confidence. *Perry,* 333 A.2d at 218; *In re Eisele,* 125 B.R. at 931.

Holloway next asserts that "the wrongful conduct of the Halls was a superseding cause." (Appellant's brief at 7). Holloway relies on *Ostrowski v. Crawford Door Sales Co. of Scranton,* 207 Pa.Super. 424, 217 A.2d 758 (1966), for the rule that "plaintiff has the burden of providing the link of causation or of providing evidence from which a reasonable inference arises that the defendant's negligence was the proximate or legal cause of the injury." *Id.* 217 A.2d at 762. In *Ostrowski,* the plaintiff was seeking personal injury damages against the installer of an automatic door. The installer of the door claimed that the plaintiff's employer's failure to notify the manufacturer of the door that the door was malfunctioning was an "independent intervening act of negligence" that "could prevent appellants' negligence from being the proximate cause." *Id.* at 762. Holloway has neglected to inform this Court of the *Ostrowski* Court's conclusion, understandably because it weighs against Holloway's claim. The Court concluded: "This regrettable inaction on [the employer's] part ... cannot excuse appellants from the legal responsibility...." *Id.*[4]

■ Nonetheless, it is true "that the extraordinary negligence of a second actor will be a superseding cause and insulate antecedent tortfeasor from liability...." *Schoenenberger v. Hayman,* 77 Pa. Cmwlth. 411, 465 A.2d 1335, 1338 (1983). Such subsequent negligence must be so extraordinary that it could not have been foreseen. *Whitner v. Von Hintz,* 437 Pa. 448, 263 A.2d 889 (1970); *Wyke v. Ward,* 81 Pa.Cmwlth. 392, 474 A.2d 375, 382 (1984). In 1991 the Superior Court of Pennsylvania found an instance of such extraordinary subsequent negligence. *American Truck v. Thorne Equipment,* 400 Pa.Super. 530,

---

**4.** The *Ostrowski* Court suggests that if the employer was the plaintiff, such inaction *might* constitute contributory negligence. *Ostrowski,* 217 A.2d at 762–63. Since this Court has determined that Eisele was not contributorily negligent, that element of the *Ostrowski* Court's ruling does not apply here.

583 A.2d 1242 (1991). In *American Truck,* the owner of a vacant building was sued for damages to a neighbor's grain elevator. A debris fire had started on her premises which spread across the street. Pursuant to a determination made by the City of Philadelphia, the grain elevator damaged by the spreading fire was demolished. During the demolition, a portion of the elevator shaft fell and damaged buildings on the premises. The owner of those buildings sought recovery from the owner of the vacant lot.

The Court concluded that "[b]ecause the negligent accumulation was too far removed from the damages to American's property and because those damages were caused by the intervening act of the demolition contractor," *id.* at 1243, the lot owner was relieved of liability. The instant case offers no evidence of such an intervening cause.

█ In no way can this Court find grounds to conclude that the Halls' behavior was "extraordinary" or unforeseeable. Pursuant to *Grainy v. Campbell,* 493 Pa. 88, 425 A.2d 379 (1981), this Court finds that the Halls' conduct was foreseeable to Holloway, a reasonable person would not regard the intervening conduct as extraordinary, and the intervening conduct was a normal consequence of Holloway's tortious actions. *Id.* 425 A.2d at 382 (citing and applying Restatement (Second) of Torts § 447). *See also Flickinger v. Ritsky,* 452 Pa. 69, 305 A.2d 40 (1973). Therefore, Holloway's request that this Court find the Halls' conduct to be an intervening cause is rejected.

█ Finally, Holloway asserts that "plaintiff failed to establish her expenses were reasonably necessary." (Appellant's brief at 8). The parties have stipulated that Eisele filed the Chapter 11 for the sole purpose of acquiring a right under 11 U.S.C. § 365 to reject the Hall Agreement in order to remove the cloud on the title created by the Hall Agreement and the Halls' suit. Stipulation of Facts, ¶ 42; *In re Eisele,* 125 B.R. at 927. Therefore, the attorney costs related to that bankruptcy action as well as the Halls' suit were incurred defending a matter resulting from Holloway's tortious conduct. *Nicholls v.*

*Zoning Board of Adjustment,* 80 Pa. Cmwlth. 247, 471 A.2d 584, 586 (1984). Eisele's conduct in response to Holloway's tortious acts were "reasonable." *Toyota Indus. Trucks v. Citizens National Bank,* 611 F.2d 465, 471 (3d Cir.1979). Eisele faced the options of either settling the claim with the Halls for $10,000, or litigating the claim—a prospect including years of litigation costs. In addition, Eisele's invoices submitted evidence ordinary and customary legal services. *Ranco Industrial Products Corp. v. Dunlap,* 776 F.2d 1135, 1140 (3d Cir.1985). Holloway's assertions to the contrary are groundless.

## V. *Eisele's cross-appeal*

Eisele alleges the Bankruptcy Court "applied an incorrect standard regarding Mrs. Eisele's request for punitive damages and misinterpreted a provision in the Rosenbloom Agreement regarding the Rosenblooms' obligations to share Mrs. Eisele's real estate broker expense." (Brief of the appellee/cross appellant Gladys B. Eisele, at 16). The Bankruptcy Court addresses Eisele's request for punitive damages by stating:

> Debtor also seeks punitive damages but none will be awarded. We find that the restitutionary recovery we will award Debtor so that she will incur no pecuniary loss, coupled with the denial of Holloway's commission, is sufficient monetary sanction. His conduct was egregious enough, however, that we will refer this matter to the Pennsylvania Real Estate Commission for appropriate investigation.

*In re Eisele,* 125 B.R. at 929.

Eisele asserts that "[t]he Court applied an incorrect legal standard regarding Mrs. Eisele's request for punitive damages...." (Brief of appellee/cross appellant at 16). Eisele is correct and, therefore, this Court will vacate the Bankruptcy Court's determination not to award punitive damages and remand with directions to make findings of fact and conclusions of law consistent with the correct legal standard.

As a general guide in assessing punitive damages, Pennsylvania recognizes the principles set forth in § 908(2) of the Restatement (Second) of Torts, which provides:

Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant. *Burke v. Maassen,* 904 F.2d 178, 181 (3d Cir.1990).

Pennsylvania cases have adopted a very strict interpretation of "reckless indifference to the rights of others." *Id.* In *Martin v. Johns–Manville Corp.,* 508 Pa. 154, 494 A.2d 1088 (1985), the Court held that punitive damages should be awarded only for "outrageous conduct, that is, for acts done with a bad motive or with a *reckless indifference* to the interests of others." *Id.* 494 A.2d at 1097–98. "In this view, it is not sufficient to show that a reasonable person in the defendant's position would have realized or appreciated the high degree of risk from his.... [The imposition of punitive damages requires] the more culpable mental state of conscious indifference to another's safety as the test for 'reckless indifference'...." *Maassen,* 904 F.2d at 181–82. There must be some evidence that the person actually realized the risk and acted in conscious disregard or indifference to it. *Martin,* 494 A.2d at 1097.

■ In sum, the law in Pennsylvania is that punitive damages are awarded if "a person knows his actions may significantly endanger others and deliberately proceeds in disregard of that risk." *Maassen,* 904 F.2d at 183. *See also SHV Coal v. Continental Grain Co.,* 526 Pa. 489, 587 A.2d 702, 704–05 (1991).

Judge Fitzgerald's findings of fact do not provide this Court with the necessary information to determine if Holloway knew that his actions might significantly endanger Eisele. Judge Fitzgerald found that Holloway

testified, and [the Court] accepts, that before he took the Hall Agreement to Debtor, he called Debtor's attorney, who did not return the calls, but he made no other attempt to ascertain the status of the Rosenbloom Agreement. Thus, Holloway never learned whether all proceedings consummating the time of the essence clause had occurred.

*In re Eisele,* 125 B.R. at 926.

Judge Fitzgerald concludes that Holloway acted "despite the insufficiency of his knowledge." *Id.* Although it could be argued, as Eisele did, that Judge Fitzgerald implicitly found Holloway's conduct to be outrageous, this Court cannot make any legal determinations based on implicit findings of the fact-finder. *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 148 (3d Cir.1986).

"The decision of whether a person's actions arise to outrageous conduct lies within the sound discretion of the fact-finder." *SHV Coal,* 587 A.2d at 705. "[T]he Bankruptcy Court, given its greater familiarity with the parties and proceedings, represents the forum best able to make such a determination in the first instance." *Abbotts Dairies,* 788 F.2d at 150.[5]

To conclude, the Bankruptcy Court should, upon remand of this matter, determine (1) whether Holloway knew that his actions would result in pecuniary loss to Eisele, and (2) whether he deliberately proceeded to act despite that knowledge. If the Court so determines, then Holloway's conduct is deemed outrageous and Eisele is entitled to punitive damages, which the Bankruptcy Court should then calculate and award. *Abbotts Dairies,* 788 F.2d at 151.

An appropriate Order will be issued.

---

**5.** Eisele's contention that Judge Fitzgerald was incorrect in her calculation of the compensatory damages is incorrect. This Court affirms Judge Fitzgerald's determination that Eisele's out-of-pocket share of the Holloway commission under the settlement agreement with the Rosenblooms is $26,745. It is irrelevant that the Bankruptcy Court assumed that the Rosen- blooms remain liable notwithstanding the forfeiture of Holloway's commission. Judge Fitzgerald calculated the compensatory damages based on what "would have been," absent Holloway's tortious conduct, not based on what Eisele will be able to *actually* receive from the Rosenblooms. *In re Eisele,* 125 B.R. at 928, n. 7.

## ORDER

AND NOW, this 9th day of October, 1991, upon consideration of the Appeal filed by Gladys B. Eisele in the above captioned matter on June 5, 1991,

IT IS HEREBY ORDERED that the Order entered by Bankruptcy Judge Fitzgerald on April 29, 1991, is hereby VACATED IN PART and the case is REMANDED to Bankruptcy Judge Fitzgerald for further proceedings consistent with this Court's Memorandum Opinion.

AND, further, upon consideration of the Cross–Appeal filed by John Holloway in the above captioned matter on July 3, 1991,

IT IS HEREBY ORDERED that said Appeal is DENIED and the Order entered by Bankruptcy Judge Fitzgerald on April 29, 1991, is hereby AFFIRMED.