904 F.2d 178
 BURKE, Raymond G. and Burke, Suzanne, Administrators of the
Estate of George M. Burke, Appellants at Nos.
89-1649 & 89-1737,
v.
MAASSEN, Jeffrey David and Malone Freight Lines, Inc.,
Appellants at No. 89-1736.
 Nos. 89-1649, 89-1736 and 89-1737.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 24, 1990.
Decided May 30, 1990.
Rehearing and Rehearing In Banc Denied
June 28, 1990.
 
 Lawrence M. Silverman (argued), Silverman & Coopersmith, Philadelphia, Pa., for Raymond G. Burke and Suzanne Burke.
 Gordon Gelfond (argued), Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Philadelphia, Pa., Robert E. Konchar, Moyer & Bergman, Cedar Rapids, Iowa, for Jeffrey David Maassen and Malone Freight Lines, Inc.
 Before SLOVITER, HUTCHINSON and COWEN, Circuit Judges.
 OPINION OF THE COURT
 COWEN, Circuit Judge.
 
 
 1
 Jeffrey David Maassen and Malone Freight Lines, Inc. (Malone) appeal from a final judgment entered against them following a jury trial in the Eastern District of Pennsylvania. They challenge the district court's denial of their motions for judgment N.O.V. and a new trial. Raymond G. Burke and Suzanne Burke, plaintiffs and prevailing parties in district court, also appeal from the judgment. They contend the district court erred in denying their motion to alter or amend the judgment. We will affirm in part and reverse in part.
 
 I.
 
 2
 Jeffrey Maassen killed George Burke at 11:30 p.m. on June 3, 1987. As Burke stood on the shoulder of the Pennsylvania Turnpike, Maassen hit him with the grille of his tractor-trailer truck, travelling faster than 60 miles per hour. Maassen admitted he was exceeding the speed limit. The Burkes presented uncontradicted evidence that Maassen had driven over fourteen hours that day, in violation of a federal motor carrier safety regulation,[1] and falsified his driver's log to make it appear he had complied with the federal regulation. There was circumstantial evidence indicating that Maassen fell asleep at the wheel and drifted onto the shoulder of the road, striking and killing George Burke.[2]
 
 
 3
 Maassen was employed by Steven Emken Trucking of Hancock, Iowa. Steven Emken Trucking in turn operated under a fleet contracting agreement with Malone Freight Lines, Inc. Malone and Maassen admitted that at all relevant times, Maassen was Malone's agent, acting within the course and scope of his employment. App. at 14.
 
 
 4
 Maassen lied to get his job. Malone requires its drivers to have at least one year verifiable over-the-road experience driving tractor-trailer trucks. On his job application, Maassen wrote that he had driven tractor-trailers for Hancock Elevator Company and Double "S" Truck Line between 1984 and 1987. He certified he had driven flatbed and hopper trailers over 410,000 miles in that period. In fact, Maassen never worked for Hancock Elevator Company. He first drove a tractor-trailer in January 1986 when he attended the National Training School, a truck driving school in Colorado. His only experience with tractor-trailers was the driving school, six weeks of driving as a trainee and five months' employment with Double "S" Truck Line. In addition, Maassen failed to note on his application that he received a speeding ticket while working for Double "S." In doing so, he violated federal trucking regulations.
 
 
 5
 Malone's department of safety performed a perfunctory verification of Maassen's application and approved it in spite of his falsehoods. For example, despite the fact that Maassen never worked at Hancock Elevator Company in any capacity, Susan Moore of Malone wrote on a checklist that she had called Hancock Elevator on February 10, 1987 and verified that Maassen had worked there between June 1984 and January 1986 and from March 1986 until the time of his application. She also wrote that he drove straight trucks for Hancock Elevator in Ohio, Kansas and Texas, his job performance was good and he had no accidents. Beyond these lies, she made the obvious error of approving Maassen's application when her own records show that she thought he had driven straight trucks and not tractor-trailers, as Malone required. Malone hired Maassen in March 1987. Two and one-half months later, the accident occurred.
 
 
 6
 Raymond and Suzanne Burke, George's parents and administrators of his estate, filed a complaint in the district court, seeking damages from Maassen and Malone under Pennsylvania's wrongful death and survival acts. The Burkes also claimed punitive damages. The case proceeded to trial before a jury. On May 3, 1989, the jury returned a special verdict. They found both Maassen and Malone were negligent and that their negligence had proximately caused George Burke's death. The jurors attached a note to the verdict, which read in part:
 
 
 7
 Malone Freight Lines was negligent and this negligence was a proximate cause of George Burke's death insofar as Jeffrey Maassen was acting as an agent of Malone and Malone was negligent through the actions of its agent.
 
 
 8
 App. at 866. All parties agree the jury's verdict means that Malone is vicariously liable for Maassen's negligence and is not liable for any negligence independent of Maassen's.
 
 
 9
 Against Maassen the jury awarded $300,000 in compensatory damages pursuant to Pennsylvania's Survival Act and $100,000 in punitive damages. Against Malone Freight Lines, the jury awarded $200,000 in compensatory damages pursuant to the Survival Act, $11,109 in compensatory damages pursuant to the Pennsylvania Wrongful Death Act and $600,000 in punitive damages. On May 30, 1989, the district court entered judgment accordingly.[3]
 
 
 10
 The Burkes learned later that Malone did not interpret the judgment as an obligation to pay the full amount of $1,211,109. In the Burkes' view, Malone was vicariously liable for all the damages resulting from Maassen's actions. They filed a motion to alter or amend the judgment pursuant to Fed.R.Civ.P. 59(e), seeking to have judgment entered against both Maassen and Malone in the sum of $1,211,109. The district court denied the motion without opinion on June 27, 1989. The Burkes filed an appeal at No. 89-1649.[4]
 
 
 11
 Maassen and Malone filed post-trial motions, arguing, among other things, that the evidence was insufficient to let the issue of punitive damages go to the jury. They sought judgment N.O.V. and a new trial. The district court denied the motions on August 2, 1989. Malone and Maassen timely appealed at No. 89-1736 and the Burkes filed a timely appeal at No. 89-1737. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291 (1982).
 
 II.
 
 12
 Maassen and Malone do not appeal the judgment of compensatory damages. They challenge instead the district court's order denying their motions for judgment N.O.V. on the issue of punitive damages. They argue that the evidence was insufficient to submit the issue to the jury or to support the jury's award. We must review the evidence in the light most favorable to the non-moving party. The district court's order must be affirmed "unless the record is 'critically deficient of the minimum quantum of evidence from which the jury might reasonably afford relief.' " Kinnel v. Mid-Atlantic Mausoleums, Inc., 850 F.2d 958, 961 (3d Cir.1988).
 
 
 13
 All parties agree that Pennsylvania law applies. As a general guide in assessing punitive damages, Pennsylvania recognizes the principles set forth in section 908(2) of the Restatement (Second) of Torts, which provides:
 
 
 14
 Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.
 
 
 15
 Martin v. Johns-Manville Corp., 508 Pa. 154, 494 A.2d 1088, 1096 (1985) (quoting Restatement (Second) of Torts Sec. 908(2)); Feld v. Merriam, 506 Pa. 383, 485 A.2d 742, 747-48 (1984).
 
 
 16
 Pennsylvania cases have adopted a very strict interpretation of "reckless indifference to the rights of others." The most recent Supreme Court case is Martin v. Johns-Manville Corp., in which the opinion announcing the judgment of the court ("the plurality opinion") held that a jury may award punitive damages only where the evidence shows the defendant knows, or has reason to know, of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act in conscious disregard of, or indifference to, that risk. See Martin, 494 A.2d at 1097. In this view, it is not sufficient to show that a reasonable person in the defendant's position would have realized or appreciated the high degree of risk from his actions. Id. The Martin plurality opinion rejects Restatement Sec. 500's general definition of "reckless disregard of safety" as the standard for imposition of punitive damages. That section states, "In order that an actor's conduct may be reckless, it is not necessary that he himself recognize it as being extremely dangerous.... It is enough that he knows or has reason to know of circumstances which would bring home to the realization of the ordinary reasonable man the highly dangerous character of his conduct." Restatement (Second) of Torts Sec. 500, comment c. Instead, Martin requires the more culpable mental state of conscious indifference to another's safety as the test for "reckless indifference" under Restatement Sec. 908. There must be some evidence that the person actually realized the risk and acted in conscious disregard or indifference to it. Martin, 494 A.2d at 1097. The reason for the rule was explained in this way:
 
 
 17
 The only purpose of punitive damages is to deter outrageous conduct. It is impossible to deter a person from taking risky action if he is not conscious of the risk.... Therefore, an appreciation of the risk is a necessary element of the mental state required for the imposition of such damages.
 
 
 18
 Martin, 494 A.2d at 1097 n. 12.
 
 
 19
 The opinion announcing the judgment of the court in Martin is not clearly the law of Pennsylvania on this issue. Only Justices Hutchinson and Flaherty joined in the reasoning of the plurality opinion. Justice McDermott, joined by Justice Papadakos, concurred in the result but wrote separately to take issue with the "conscious disregard" standard. In their view, persons should be liable in punitive damages for "wanton misconduct," that is, acts done in reckless disregard of another's peril where the actor "has knowledge of sufficient facts to cause a reasonable man to realize the existing danger." Martin, 494 A.2d at 1101 (quoting Fugagli v. Camasi, 426 Pa. 1, 229 A.2d 735, 736 (1967)). Justices Nix and Zappala concurred in result only, without stating their reasons; Justice Larsen did not participate. Thus, a majority of the Supreme Court has not decided whether punitive damages may be awarded only where there is proof of conscious disregard of a known risk, or whether disregard of a risk that would be obvious to a reasonable person would suffice.
 
 
 20
 As Justices McDermott and Papadakos wrote, the Martin plurality opinion marks a departure from certain decisions of the Pennsylvania Supreme Court, such as Fugagli v. Camasi. Nonetheless, the plurality opinion in Martin appears to be the best available indication of Pennsylvania's law in this area. Pennsylvania's Supreme Court has not spoken on the subject since Martin and in subsequent cases, Pennsylvania's Superior Court has not applied a "reasonable man" standard, but followed the lead of Justices Hutchinson and Flaherty, adopting and applying the "conscious disregard" formulation. See Field v. Philadelphia Elec. Co., 388 Pa.Super. 400, 565 A.2d 1170, 1182-83 (1989); Brandimarti v. Caterpillar Tractor Co., 364 Pa.Super. 26, 527 A.2d 134, 138-39 (1987), allocatur denied, 517 Pa. 629, 539 A.2d 810 (1988). In Villari v. Terminix Int'l, Inc., 663 F.Supp. 727, 734 (E.D.Pa.1987), a district court applying Pennsylvania law also adopted the conscious disregard standard. Ivins v. Celotex Corp., 115 F.R.D. 159 (E.D.Pa.1986), after extensive review of the law of Pennsylvania in this area, rejected the Martin plurality's approach, concluding that it did not constitute a definitive statement of the law of Pennsylvania. The Ivins court, however, did not have the benefit of the subsequent Pennsylvania Superior Court decisions cited above. In the absence of a clear pronouncement from the state's highest court, a federal court may consider the decisions of the state's intermediate appellate courts. Erie Castings Co. v. Grinding Supply, Inc., 736 F.2d 99, 100 (3d Cir.1984). In addition, the rule of the opinion announcing the judgment of the court in Martin furthers the purpose of punitive damages, which is to punish and deter "conduct involving some element of outrage similar to that usually found in crime." Restatement (Second) of Torts Sec. 908, comment b. Certainly cases in which there is evidence that the defendant acted intentionally, with an evil motive such as to harm the plaintiff, fit this description. The next most culpable state of mind is the one identified in the Martin plurality: where it is shown that a person knows his actions may significantly endanger others and deliberately proceeds in disregard of that risk. In sum, we predict the Pennsylvania Supreme Court would adopt the standard set forth in the Martin plurality opinion were it to confront the issue today.
 
 
 21
 In light of that standard, we examine the evidence respecting Maassen. Maassen gave false answers on his employment application. He wrote he had extensive experience driving tractor-trailer trucks when in fact he had driven tractor-trailers for little more than six months, a month and a half of which he spent as a trainee.
 
 
 22
 The false application helped put him behind the wheel of a Malone tractor-trailer on June 3, 1987. When he killed George Burke, Maassen had driven over 14 hours in a single day, directly in violation of a federal trucking regulation. There was further evidence to show that Maassen had fallen asleep at the wheel. He acknowledged he knew the regulation. He also admitted he was speeding. Following the accident, Maassen wrote false entries in his driving log and gave false answers at a deposition to cover up the violation.
 
 
 23
 The record is critically deficient of evidence showing Maassen consciously appreciated the risk of fatigue and the potential for fatal accidents that accompanies driving for more than ten hours. The evidence shows that Maassen was provided with a copy of the federal motor carrier safety regulations. Maassen admitted he read them and knew the ten hour rule. The ten hour regulation itself, however, makes no mention of its purpose to avoid driver fatigue and accidents, nor is this purpose set forth elsewhere in the part containing that regulation. It can be argued that a reasonable man in Maassen's position, after reading the ten hour rule, may have realized the risk the regulation was designed to avoid. The record contains no evidence, however, that Maassen himself appreciated this risk.[5] Nor could a jury infer from the evidence that Maassen consciously appreciated the risk of prolonged driving without relying on some conception of what a reasonable man in Maassen's position might have thought. Under the opinion announcing the judgment of the court in Martin, this is not adequate proof to support an award of punitive damages.
 
 
 24
 There is no doubt that Maassen behaved reprehensibly by lying on his employment application, falsifying his driver's logs and lying during his deposition. None of these facts, however, show that Maassen consciously appreciated the risk of driving more than ten hours. If anything, his attempts at concealment show Maassen realized the risk too late to avoid it. According to Martin, such evidence is not relevant to assessing punitive damages. Martin stated that punitive damages are intended to deter risky behavior that causes harm; they are not a sanction for obstruction of justice. Maassen's attempts at covering up his wrongdoing are not sufficient evidence from which a jury could conclude that Maassen consciously appreciated the risk of his actions prior to the accident. According to Martin, "It is impossible to deter a person from taking risky action if he is not conscious of the risk." 494 A.2d at 1097 n. 12. The district court erred in denying Maassen's motion for judgment N.O.V. on the issue of punitive damages.
 
 
 25
 Like Maassen, Malone Freight Lines also sought judgment N.O.V. on the issue of punitive damages. This aspect of the appeal is simplified because the Burkes and Malone agree, and indeed vigorously argue, that the jury awarded punitive damages against Malone solely on the basis of vicarious liability. Since the evidence is insufficient to allow an award of punitive damages against Maassen, it follows that no punitive damages can be awarded vicariously against Malone. The district court erred, therefore, in denying Malone's motion for judgment N.O.V.
 
 
 26
 In light of our disposition of the orders denying judgment N.O.V., there is no need to consider Malone and Maassen's arguments regarding their motions for a new trial.
 
 III.
 
 27
 The Burkes argue that the district court erred in denying their motion to alter or amend the judgment. The Burkes sought a judgment awarding them $1,211,109--$511,109 in compensatory damages and $700,000 in punitive damages--for which both Maassen and Malone would be liable. We need not review the district court's order as it relates to compensatory damages. At oral argument, counsel for Maassen and Malone agreed that the judgment should be amended to award $511,109 in compensatory damages against both defendants. Because we will reverse the district court's judgment respecting punitive damages, the Burke's motion with respect to those damages is moot.
 
 IV.
 
 28
 We will affirm in part and reverse in part the judgment of the district court. We will reverse the district court's orders denying judgment N.O.V. to Malone and Maassen on the issue of punitive damages. By reason of the stipulation of the parties, we will order that judgment be entered in favor of the Burkes and against both defendants in the amount of $511,109 for compensatory damages. Each party to bear its own costs.
 
 
 29
 SLOVITER, Circuit Judge, dissenting.
 
 
 30
 I believe that even if the majority has correctly predicted Pennsylvania law, plaintiffs provided ample evidence from which the jury could have inferred that Maassen was conscious of the risk his conduct created and that, therefore, we should not disturb the award of punitive damages.
 
 
 31
 As the majority opinion recognizes, Pennsylvania's law of punitive damages is not entirely clear. In the plurality opinion in Martin v. Johns-Manville Corp., 508 Pa. 154, 494 A.2d 1088 (Pa.1985), two Justices of the Pennsylvania Supreme Court, one being Judge Hutchinson now of this court, held that punitive damages may be assessed only when the defendant knew or had reason to know of a high risk, and acted or failed to act in conscious disregard of or indifference to that risk. 494 A.2d at 1096-98. The other Justices did not adopt this view, and, indeed, two Justices explicitly disavowed the plurality's approach, stating that it was inconsistent with prior Pennsylvania cases that had permitted punitive damages when a defendant knows or has reason to know of facts that would cause a reasonable man to realize the existence of a risk to others. 494 A.2d at 1101-02 (McDermott, J., and Papadakos, J., concurring in the result). Although the Pennsylvania Superior Court and district courts applying Pennsylvania law have followed the Martin plurality in a variety of circumstances, none has done so in the context of a motor vehicle accident. I, unlike the majority in this case, am not convinced that the Pennsylvania Supreme Court would adopt the standard set forth in the Martin plurality opinion were it confronted with the issue before us today. However, accepting arguendo the standard adopted by the plurality until the Pennsylvania Court clarifies the state of the law, I believe that plaintiffs produced sufficient evidence to sustain the award of punitive damages.
 
 
 32
 Jeffrey Maassen's conduct which led to Burke's death was shocking. He lied about his driving experience to get his job as a truck driver. At the time of the accident he had already driven over fourteen hours in violation of a federal trucking regulation and was driving above the speed limit. After the accident he falsified records to hide his violation of federal law. Viewing the evidence at trial in the light most favorable to plaintiffs, we can conclude, as the jury could have, that Maassen had fallen asleep at the wheel.
 
 
 33
 The majority finds that "[t]he record is critically deficient of evidence showing that Maassen consciously appreciated the risk" of driving more than the 10 hours a day permitted by federal regulation. Maj. op. at 183. However, Maassen admitted that he knew of the federal requirements he had violated. Although there is no direct evidence that Maassen knew of the risks created by his conduct, the fact that he falsified records to disguise the length of time he had driven would support a finding that he realized the connection between driving excessive hours and untoward consequences, such as that which occurred here.
 
 
 34
 The risk of a relatively inexperienced truckdriver driving a large tractor-trailer over fourteen hours a day while exceeding the speed limit is so patently apparent that one need not rise to the level of intelligence of a "reasonable" person to appreciate the danger. Surely Pennsylvania would conclude that there is some conduct, other than the proverbial call of fire in a crowded theater, which by its very nature carries an obvious risk of danger. It is both illogical and unfair to require evidence of a subjective appreciation of the risk of danger in such situations.
 
 
 35
 It is not inconsistent with the Martin plurality to permit the jury to infer that people are aware of the risks of obviously dangerous acts. In Martin, the issue was whether an insulation worker, who developed asbestosis while working with asbestos products manufactured by the defendants, was entitled to punitive damages because defendants had not placed warning labels on their products in the period before 1964 even though the medical profession then knew the dangers asbestos posed. 494 A.2d at 1095. In analyzing whether punitive damages were appropriate, the Martin plurality stressed that the distinction between 'indifference to a known risk' and 'failure to appreciate the risk created by a known danger' is "particularly important in determining what facts justify punitive damages in cases where, as here, liability is based on failure to warn against the risk of a disease with a long latency period arising out of exposure to a useful but unavoidably dangerous product." Id. at 1097. The Martin plaintiffs did not argue that defendants appreciated the risks asbestos installers faced; they had merely argued that defendants had access to literature that would warn them of the risks. Id. at 1100.
 
 
 36
 In contrast to the Martin situation, where an appreciation of the risks required research and technical expertise, the risks associated with driving a tractor-trailer for an extended period without a rest, at an illegal speed, and without adequate experience are apparent to anyone with average intelligence. Thus, the unwillingness of the Martin plurality to infer the defendant's appreciation of the risk in Martin does not portend the same reluctance in this situation.
 
 
 37
 It is of some significance to the inquiry before us that in Kirkbride v. Lisbon Contractors, Inc., 521 Pa. 97, 555 A.2d 800 (1989), the Pennsylvania Supreme Court limited the Martin plurality's decision that punitive damages must bear a reasonable relationship to the amount of compensatory damages awarded to the products liability context in which Martin arose. After noting in Kirkbride "that this proposition did not command a majority," 555 A.2d at 803, the court commented that the "genesis for this theory appears to have arisen out of products liability litigation as an attempt to prevent a single plaintiff from receiving punitive damages owed to all consumers.... [T]he harm it was intended to prevent is not present in this case. Therefore, any reliance upon Martin in the appeal sub judice would be misplaced." Id. It thus seems likely to me that the same court will, when the opportunity arises, similarly limit the Martin plurality's view that punitive damages may be awarded only where there is proof that the defendant was subjectively conscious of the risk s/he created.
 
 
 38
 Although we have not explicitly made the distinction between products liability cases and other Pennsylvania torts, in fact we have applied the Martin plurality approach only in an asbestos case. See Wisniewski v. Johns-Manville Corp., 812 F.2d 81 (3d Cir.1987). In other contexts, we have upheld the award of punitive damages. For example, in Woodson v. AMF Leisureland Centers, Inc., 842 F.2d 699 (3d Cir.1988), we sustained punitive damages on behalf of a barmaid in a lounge owned by the defendant who was fired for refusing to serve an alcoholic beverage to a visibly intoxicated patron. In upholding the award we looked to the Pennsylvania "policy to safeguard the lives of innocent motorists and pedestrians," as evidenced by its dramshop law, id., and to Pennsylvania decisions holding that evidence of driving while intoxicated may be a sufficient basis for the award of punitive damages. Id. (discussing Focht v. Rabada, 217 Pa.Super. 35, 268 A.2d 157, 161 (1970)). We noted that the Pennsylvania court had stated that "[a]utomobiles represent the most lethal and deadly weapons today entrusted to our citizenry." Id. In Woodson we did not require proof that defendant knew the risks of drunk driving or that the state dramshop act was designed to prevent the firing of employees such as plaintiff. We inferred the necessary knowledge from the obviousness of the risk and the importance of the policies at stake.
 
 
 39
 Because I believe that the risk of Maassen's conduct was obvious and that the policies at stake here are comparable to those in Woodson, I respectfully dissent from the majority's judgment overturning the jury's punitive damage award.
 
 
 
 [1]
 The regulation provides, with exceptions not relevant here:
 [N]o motor carrier shall permit or require any driver used by it to drive nor shall any such driver drive:
 (1) More than 10 hours following 8 consecutive hours off duty;
 
 
 [49]
 C.F.R. Sec. 395.3 (1989)
 
 
 [2]
 Theresa M. Kaza and her daughter, Sharon Hertzog, were driving behind Maassen's truck when the accident occurred. Each testified that the truck appeared to move to the right, as if entering a curve, just before the accident happened. App. at 197, 281. They later learned that the Turnpike is absolutely straight near the scene of the accident. App. at 190
 Both testified that the truck did not slow down or put on brake lights before or after the accident. App. at 197, 282-83. It "just kept going" until further down the road. App. at 282. Pennsylvania troopers found the truck stopped four tenths of a mile from the accident scene. App. at 76.
 
 
 [3]
 Judgment was entered in these words:
 It is further ORDERED that judgment is entered in favor of plaintiff against defendant Jeffrey Maassen in the amount of $300,000 in compensatory damages pursuant to Pennsylvania Survival Act and $100,000 in punitive damages. Judgment is entered in favor of plaintiffs against defendant Malone Freight Lines, Inc. in the amount of $200,000 in compensatory damages pursuant to the Survival Act; in the amount of $11,109 in compensatory damages pursuant to the Pennsylvania Wrongful Death Act; and in the amount of $600,000 in punitive damages.
 App. at 871.
 
 
 [4]
 The Burkes' appeal at No. 89-1649 was premature because Maassen and Malone's post-trial motions remained pending in the district court at the time. See Fed.R.App.P. 4(a)(4). Hence, the appeal at No. 89-1649 must be dismissed
 
 
 [5]
 Maassen's knowledge might have been proved by an admission that he knew the ten hour rule was designed to prevent fatigue and accidents. Another method might have been to ask his employers whether anyone had ever specifically told Maassen that if he drove more than ten hours, he might fall asleep and cause an accident. Obviously, other methods of proof are possible as well