UNITED STATES of America

v.

**Gulvinder Singh SANDHU.**

**Criminal Action No. 02–247.**

United States District Court,
E.D. Pennsylvania.

Nov. 15, 2006.

Seth Weber, U.S. Attorneys, Philadelphia, PA, for Plaintiff.

MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

On September 22, 1999, Gulvinder Singh Sandhu ("Sandhu" or "Defendant"), a commercial truck driver, was driving through Berks County, Pennsylvania, when his truck swerved and his tractor trailer crashed into a van, killing four members of a family and seriously injuring two others.

The Berks County district attorney brought charges against Sandhu for vehicular manslaughter and related offenses. *See Commonwealth v. Sandhu,* Docket No. 4838/99 (Pa. Ct. C.P., Berks County, filed Dec. 7, 1999). These charges were dismissed by the state court, and Sandhu ultimately pled guilty to the summary offense of careless driving and paid a fine. *Id.*

After the accident, the United States Department of Transportation (DOT) initiated an investigation into Sandhu's driving

records and determined that he had falsified his commercial truck driver daily logbook during August and September 1999 (the time period immediately prior to the accident) by incorrectly listing the dates and times he was driving and sleeping.

On April 23, 2002, Sandhu was indicted by a federal grand jury on 42 counts of making false statements in a matter within the jurisdiction of the executive branch of the federal government, in violation of 18 U.S.C. § 1001. Pursuant to a plea agreement, Defendant pled guilty on August 3, 2006, to all 42 counts in the indictment.

The final chapter of this tragic episode will play out on December 4, 2006, when Sandhu is to be sentenced by the Court on the federal charges. The Sentencing Guidelines applicable to the case recommend a term of imprisonment of 8 to 14 months. The Government recommends that Defendant be sentenced at the high end of the Guidelines. Defendant argues that, to the contrary, the sentence should be at the low end.

The issue is what evidence may be considered to assist the Court in determining (1) where within the range specified by the Sentencing Guidelines (which are now advisory) Defendant should be sentenced; and/or (2) under the Guidelines, whether an upward departure is recommended; and/or (3) the proper calculus under the factors delineated in 18 U.S.C. § 3553(a).

Defendant has moved to strike both the proposed testimony of an alleged eyewitness to the accident and the proposed victim-impact statements.[1] A corollary to the motion to strike is whether the purpose of the pertinent federal regulation promulgated by the DOT may be appropriately considered in applying the § 3553(a) factors.

## I. BACKGROUND

Sandhu, a Canadian citizen, holds the equivalent of a United States commercial motor vehicle (CMV) driver's license. A CMV driver's hours, and the forms on which he is to keep his hours, are regulated by the Federal Motor Carrier Safety Administration (FMCSA), a division of the DOT, and governed by title 49, part 395 of the Code of Federal Regulations. Relevant here, a CMV truck driver must comply with the so-called "10–hour rule"[2]: he cannot drive "more than 10 hours following 8 consecutive hours off duty." 49 C.F.R. § 395.3(a)(1) (1998).

CMV drivers must record their duty status for each 24–hour period, listing, on a prescribed form, when they are (1) off-duty, (2) in the sleeper berth, (3) driving, or (4) on-duty but not driving. *Id.* § 395.8(a), (b). The driver is required to file this duty status form (commonly called a logbook) with his employer,[3] *id.* § 395.8(i), who retains the logbooks for six months in case of inspection by the FMCSA, *id.* § 395.8(k). It is the connec-

---

1. Defendant formally objected to this evidence in the Presentence Report, argued it in the sentencing memorandum, and mentioned it at the November 2, 2006, hearing. The Court has construed these objections as a motion to strike the proposed eyewitness testimony and victim-impact statements. *See* Doc. No. 28.

2. The regulations also contain a "15–hour rule," which prohibits CMV drivers from driving "for any period after having been on duty

15 hours following 8 consecutive hours off duty." 49 C.F.R. § 395.3(a)(2) (1998). The 15–hour rule is not at issue here.

3. Section 395.8(f)(7) provides that "[t]he driver shall certify to the correctness of all entries by signing the form containing the driver's duty status record with his/her legal name or name of record. The driver's signature certifies that all entries required by this section made by the driver are true and correct."

tion between the violation of the federal regulation and the deaths and injuries that occurred from the accident that is at issue.

The plea agreement recounted the analysis under the Sentencing Guidelines. The base offense level is 6, U.S.S.G. § 2F1.1(a) (1989).[4] There is an upward adjustment of 2 levels for more than minimal planning, *id.* § 2F1.1(b)(2)(A). In the plea agreement, the parties disputed whether there should be an upward adjustment for conscious or reckless risk of serious bodily injury, *id.* § 2F1.1(b)(6)(A), but Defendant has since stipulated to this adjustment. This upward adjustment increases the offense level to 13. The plea agreement also noted a 2–level downward adjustment for acceptance of responsibility, *id.* § 3E1.1(a). The total offense level is therefore 11. With no discernable criminal history, Sandhu has a criminal history category of I.

A total offense level 11 and criminal history category I yields a Guidelines range of 8 to 14 months imprisonment.[5] The maximum penalty under the statute, however, is significantly harsher. Each violation of 42 U.S.C. § 1001 carries a possible prison term of 5 years. Therefore, by pleading guilty to 42 counts, San-dhu agreed to an exposure of 210 years in prison.

Though the Government made no promises as to its sentencing recommendation in the plea agreement,[6] its sentencing memorandum recommends a sentence of 14 months, at the high end of the Guidelines range.[7] The Probation Office, in the Presentence Investigation Report (PSI), also recommends a sentence of 14 months. Defendant, in his sentencing memorandum, has asked for a sentence of 8 months, at the low end of the Guidelines range.

Neither the Government nor Defendant has moved for a departure under the Guidelines. However, the PSI notes that an upward departure may be warranted under U.S.S.G. § 5K2.1, because "death resulted."

At sentencing, the Government proposes to offer the testimony of Glen Dubs, and alleged eyewitness to the accident.[8] According to the Government's proffer, Dubs will testify that he saw Sandhu's truck swerving shortly before the accident.

Additionally, the Government proposes to offer the testimony of two relatives of the victims of the accident to describe the

---

4. As the charges stem from falsifications made in late 1999, both parties agree that the proper Sentencing Guidelines Manual is the November 1, 1998, edition.

5. Of course, other elements of a sentence, such as a fine and supervised released, are applicable, but they are not relevant to the discussion in this Memorandum.

6. Indeed, the agreement stated that "the Court may make factual and legal determinations that differ from these stipulations and that may result in an increase or decrease in the Sentencing Guidelines range and the sentence that may be imposed."

7. The Government is bound by its written recommendation in its sentencing memoran-

dum and cannot now or at the sentencing hearing advocate a sentence above the Guidelines range (8 to 14 months). It would be unfair for the Government to make a recommendation in writing in the sentencing memorandum and then argue to the contrary at the sentencing hearing.

8. As noted above, *supra* note 7, the Government can introduce this evidence (the eyewitness testimony and the victim-impact statements) *only* to support its recommendation of a sentence at the high end of the Guidelines range. The Court, however, can consider this evidence in determining whether a sentence *above* the Guidelines range is appropriate.

effect that the accident has had on them and other relatives of the victims.[9]

Finally, the Court intends to consider whether the safety purpose of the federal regulation concerning the 10–hour rule should inform the Court's decision in applying the 18 U.S.C. § 3553(a) factors.

## II. DISCUSSION

■ At bottom, this evidentiary dispute centers around whether the accident (and its consequences), which was the subject of the state prosecution, is relevant to the falsification of the logbooks, which is the federal offense now before the Court, and therefore appropriate to be considered at sentencing.

### A. Evidence To Aid the Court in Determining Where Within the Guidelines Range Defendant Should Be Sentenced

Congress has given district courts broad discretion [10] to consider any relevant material at sentencing:

No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3661. The Sentencing Guidelines likewise allow the Court to consider any relevant information when imposing a sentence within the Guidelines range:

In determining the sentence to impose within the guideline range ... the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.

U.S.S.G. § 1B1.4.

"[C]ourts imposing sentence are 'free to consider a wide range of relevant material,'" *United States v. Deaner*, 1 F.3d 192, 198–99 (3d Cir.1993) (quoting *Payne v. Tennessee*, 501 U.S. 808, 820–21, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)), limited only by the requirement that "[i]nformation used as a basis for sentencing under the

9. The Government posited at the November 2, 2006, hearing that members of the family killed in the accident are entitled to give testimony at Sandhu's sentencing. This is not necessarily so. While 18 U.S.C. § 3771 explicitly gives crime victims the right to testify at sentencing hearings, subsection (e), which defines "crime victim," might disqualify the family members in this case. "Crime victim" is defined in the statute as "a person directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e). Only if, after examining the parties' evidentiary submissions, the Court determines by a preponderance of the evidence that there is a nexus between the falsifications and the accident, will the family members be considered "crime victims" for purposes of giving testimony.

10. The standard by which the district court finds facts for purposes of sentencing is preponderance of the evidence. *United States v. Watts*, 519 U.S. 148, 149, 117 S.Ct. 633, 136

L.Ed.2d 554 (1997); *United States v. Cooper*, 437 F.3d 324, 330 (3d Cir.2006).

Note that *United States v. Kikumura*, 918 F.2d 1084, 1102 (3d Cir.1990), had held that certain sentencing enhancements—those that *significantly* increase the recommended sentence—must be proved by clear and convincing evidence. However, *United States v. Grier*, 449 F.3d 558, 570 (3d Cir.2006), overruled *Kikumura* on this point, stating that *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), had counseled that all findings of fact for purposes of sentencing are found by the district judge on a preponderance of the evidence standard. *Grier* itself, though, was vacated in July 2006 and the Third Circuit is currently considering the issue en banc. 453 F.3d 554 (3d Cir.2006) (en banc).

Guidelines must have 'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Miele*, 989 F.2d 659, 663 (3d Cir.1993) (quoting U.S.S.G. § 6A1.3(a)).

Evidence of Defendant's actions immediately prior to the accident implicates the "conduct of the defendant" prong under both the statute and the Guidelines. The evidence is therefore admissible at sentencing to determine where within the Guidelines range to sentence Defendant, provided the evidence is reliable.

### B. *Departures and Variances*[11] *After Booker*

The Supreme Court case of *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), constituted a sea change in sentencing procedure and law. After *Booker*, the nature of the inquiry at sentencing is necessarily broader, as the Sentencing Guidelines are no longer mandatory and the Court has considerably more discretion. The wisdom of the *Booker* decision is reflected in the sentencing in this case: were the Guidelines still mandatory, the Court would be unable to take into account in a comprehensive fashion the unique circumstances (and consequences) involved here.

The Third Circuit has recently reaffirmed the three-step sentencing process that district courts are to follow post-*Booker:*

(1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker.*

(2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that

departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.

(3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Jackson,* No. 05–4091, 467 F.3d 834 (3d Cir.2006) quoting *United States v. Gunter,* 462 F.3d 237, 247 (3d Cir.2006).

While the Supreme Court in *Booker* invalidated that portion of the U.S.Code (18 U.S.C. § 3553(b)) that made the Sentencing Guidelines mandatory, "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." 543 U.S. at 264, 125 S.Ct. 738.

The Court exercises its discretion by considering the relevant statutory factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1);

(2) the need for the sentence to reflect the seriousness of the crime, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed education or vocational training, medical care, and other correctional treatment in the most effective manner, § 3553(a)(2);

(3) the kinds of sentences available, § 3553(a)(3);

---

11. Consistent with the Third Circuit's teaching, the Court will refer to "post-Booker discretionary sentences not based on a specific Guidelines departure provision as 'variances.'" *United States v. Vampire Nation,* 451 F.3d 189, 195 n. 2 (3d Cir.2006).

(4) the applicable Guidelines sentence, § 3553(a)(4);

(5) the pertinent policy statements of the Sentencing Commission, § 3553(a)(5);

(6) the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and

(7) the need to provide restitution to victims, § 3553(a)(7).

*United States v. King*, 454 F.3d 187, 194 (3d Cir.2006). The Guidelines range is now just one of the factors that district courts must consider in imposing the sentence. *United States v. Cooper*, 437 F.3d 324, 329 (3d Cir.2006). Indeed, "a within-[G]uidelines range sentence is not necessarily reasonable *per se*."[12] *Id.* at 331. The Court must undertake its own analysis of the sentencing factors.

While at least one circuit has held that the concept of a "departure" is obsolete post-*Booker*, *see United States v. Johnson*, 427 F.3d 423, 426 (7th Cir.2005), the Third Circuit has made clear that district courts are to use the analytical tools of both departures and variances. *United States v. Severino*, 454 F.3d 206, 210 (3d Cir. 2006). For instance, the Third Circuit recently counseled that "district courts should be careful to articulate whether a sentence is a departure or a variance from an advisory Guidelines range." *Vampire Nation*, 451 F.3d at 198.

King is instructive in understanding the differences between departures and variances after *Booker*. In *King*, the Third Circuit upheld the district court's imposition of a sentence almost double the top of the Guidelines range. 454 F.3d at 189. The district court, after adopting the recommendations in the PSI, increased the defendant's "sentence by applying § 3553(a) instead of potentially applicable Guidelines departures." *Id.* at 195. The Third Circuit held that the district court's procedure for imposing the higher sentence was not error, because the court "considered the relevant factors in th[e] case, and it reasonably applied those factors to the circumstances of th[e] case." *Id.*

> The Third Circuit emphasize[d] that the sentencing courts in this Circuit should continue to follow the requirement to "consider" the Guidelines by calculating a Guidelines sentence as they would have before *Booker*, including formally ruling on the motions of both parties and stating on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and taking into account this Circuit's pre-*Booker* caselaw, which continues to have advisory force.

*Id.* at 196. "We decline to hold that it was necessarily error to increase King's sentence by applying § 3553(a) instead of potentially applicable Guidelines departures." *Id.* at 195.

The Third Circuit's pre-*Booker* caselaw continues to have advisory force. *Id.* at 196. And the Third Circuit has described when it is proper for a district court to depart from the Guidelines range:

> [T]he Commission conceives of each offense guideline as "carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." U.S.S.G., Ch. 1, Pt. A intro. p.s. 4(b). In the unusual case where a

---

**12.** Note that the Supreme Court will consider this Term whether it is "consistent with *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), to accord a presumption of reasonableness to within-Guidelines sentences." *Rita v. United States*, Docket No. 06–5754, —— U.S. ——, 127 S.Ct. 551, 166 L.Ed.2d 406 (U.S.2006) (Mem.). The issue before the Supreme Court in *Rita* is not implicated here.

defendant's conduct falls outside the typical "heartland," the court may consider a departure from the guidelines range. *Id.* A district court may impose a sentence outside the guideline range where "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b); *see* U.S.S.G. § 5K2.0.

*United States v. Yeaman,* 194 F.3d 442, 461–62 (3d Cir.1999).

The Third Circuit also draws from *Koon v. United States,* 518 U.S. 81, 95, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), in its instructions to district courts on the proper analysis when considering a departure:

First, identify the factor or factors that potentially take the case outside the Guidelines' "heartland" and make it special or unusual. Second, determine whether the Guidelines forbid departures based on the factor, encourage departures based on the factor, or do not mention the factor at all. Third, apply the appropriate rule: (1) if the factor is forbidden, the court cannot use it as a basis for departure; (2) if the factor is encouraged, the court is authorized to depart if the applicable guideline does not already take it into account; (3) if the factor is discouraged, or encouraged but already taken into account by the applicable guideline, the court should depart only if the factor is present to an exceptional degree, or in some other way makes the case different from the ordinary case in which the factor is present; or (4) if the factor is unmentioned, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether the factor is sufficient to take the case out of the Guideline's heartland.

*United States v. Iannone,* 184 F.3d 214, 226 (3d Cir.1999) (internal citations and quotation marks omitted).

With these teachings in mind, the Court will examine whether the evidence at issue is appropriate to determine the applicability of a departure under the Guidelines or a variance under § 3553(a).

### 1. *Departure under the Guidelines*

The Probation Office, in the PSI, suggested that the Court could upwardly departure under U.S.S.G. § 5K2.1, which provides that "[i]f death resulted, the court may increase the sentence above the authorized guideline range."

The Sentencing Guidelines accord the Court broad discretion to hear relevant information in deciding whether to depart from the Guidelines range:

In determining ... whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.

U.S.S.G. § 1B1.4.

The Third Circuit is clear that the Court can consider any relevant conduct in determining whether a departure is warranted. For example, the Court can consider an offense that was dropped pursuant to a plea agreement. *See United States v. Baird,* 109 F.3d 856, 860 (3d Cir.1997) ("[E]ven in the plea bargain context, conduct underlying dismissed counts may support an upward departure."); U.S.S.G. § 1B1.4 commentary, background ("[I]f the defendant committed two robberies, but as part of a plea negotiation entered a guilty plea to only one, the robbery that

was not taken into account by the guidelines ... may provide a reason for an upward departure."). Or, the Court can consider an offense of which a jury acquitted the defendant. *See United States v. Ryan,* 866 F.2d 604, 609 (3d Cir.1989) ("[T]he [Sentencing] Commission intended to permit sentencing courts to continue to consider [evidence on counts of which a defendant was acquitted] in determining whether to depart from the applicable guideline."). Finally, the Court can consider conduct over which a federal court would not have jurisdiction, and indeed conduct that was never formally charged. *See United States v. Pollard,* 986 F.2d 44, 47 (3d Cir.1993) ("A district court [is authorized] to consider uncharged, relevant state conduct as well as federal.").[13]

In *United States v. Kim,* 896 F.2d 678 (2d Cir.1990)—which was cited extensively and approvingly in *Baird*—the Second Circuit held, in the context of whether an upward departure was appropriate, that the conduct in question was sufficiently related to the convicted offense. The defendant had pled guilty to a single count of making a false statement concerning immigration matters, but was charged in a six-count indictment: two counts of smuggling aliens, one count of making a false statement, one counting of obtaining his own illegal entry, and two counts involving possession and importation of counterfeit money. *Id.* at 680. The court held that the two counts of smuggling illegal aliens and the one count of obtaining illegal entry were obviously related to the count on which the defendant was convicted: making a false statement concerning immigration matters. *Id.* at 686. The court also held that the counts alleging possession and importation of counterfeit money,

though more tenuous to the false statement charge, "bore a sufficient relationship to the alien smuggling misconduct to be available for consideration as a basis for departure." *Id.*

In examining the connection between a false statement conviction and a § 5K2.1 departure, the Sixth Circuit held that "[c]ausing death is sufficiently outside of the heartland of the fraud, forgery, and false statement offenses to warrant a departure from the Sentencing Guidelines." *United States v. Mayle,* 334 F.3d 552, 564 (6th Cir.2003). Indeed, the court in *Mayle* interpreted the upward departure standard in the context of § 1B1.3(a), which defines "relevant conduct."

In reviewing the application of § 5K2.1, some courts have determined that death or serious injury must be intended or knowingly risked. *See, e.g., United States v. Rivalta,* 892 F.2d 223, 232 (2d Cir.1989) ("[I]t is not enough for the district court to conclude, as it did, that there was a 'nexus' between 'the disappearance of the deceased and the disappearance of the diamonds,' or that they were 'intertwined.' To justify an upward departure under § 5K2.1 on these facts, Judge Duffy would have to find that 'death or serious injury was intended *or* knowingly risked.'" (emphasis added)); *United States v. White,* 979 F.2d 539, 545 (7th Cir.1992) ("We follow the Second Circuit [in *Rivalta*] in requiring that § 5K2.1 departures be supported by findings that death was intentionally or knowingly risked. By setting forth this standard, the Sentencing Commission indicated that such departures are appropriate only when the defendant is actually aware that a fatal outcome is like-

---

13. Though *Pollard* dealt with which guideline to use, not whether there should be a departure at sentencing, it is still on point: "The range of information that may be considered at sentencing is broader than the range of information upon which the applicable sentencing range is determined." U.S.S.G. § 1B1.3 commentary, background.

ly."). Other courts have relaxed the standard, looking instead whether death was foreseeable. *See, e.g., United States v. Scheetz*, 293 F.3d 175, 191 (4th Cir.2002) ("We see no basis for foreclosing a departure under USSG § 5K2.1 or USSG § 5K2.2 when a defendant helps put into motion a chain of events that risks serious injury or death, even when an intent to harm is entirely absent and the defendant was not directly responsible for the death."); *United States v. Diaz*, 285 F.3d 92, 101 (1st Cir.2002) ("We see no basis for foreclosing departure under § 5K2.1 when a defendant puts into motion a chain of events that risks serious injury or death, even when an intent to harm is entirely absent and the defendant was not directly responsible for the death."); *United States v. Metzger*, 233 F.3d 1226, 1228 (10th Cir. 2000) ("The sentencing court was required under U.S.S.G. § 2B3.1(b)(3)(B) to hold Metzger responsible for the 'chain of events' that he 'put in motion' with his robbery."). The Third Circuit has not weighed in on this issue.

In all five cases, no matter the standard, the court found a sufficient connection between the convicted offense and the relevant conduct.[14] The latter courts undertook a foreseeability analysis: did the defendant knowingly risk the victim's death by putting in motion a chain of

event with foreseeable consequences? An answer of yes yields a sufficient relationship, and the evidence will be admitted may provide the basis for an upward departure.

There are two scenarios that the Court will consider at sentencing to determine whether an upward departure under 5K2.1 is appropriate. The first scenario is whether Sandhu was violating the 10–hour rule at the time of the accident.[15] If he was, then there is a sufficient nexus between the falsification of the logbooks and the accident. CMV drivers must keep accurate records of their driving time to submit to the DOT, so that the DOT can ensure that CMV drivers are driving safely on the roads. If a driver submits inaccurate records, this is evidence that the driver was attempting to circumvent (or flat-out violate) the DOT's safety regulations. If a driver submits a false logbook to conceal that he was in violation of the 10–hour rule and gets in an accident while in violation of the rule, then there is a sufficient nexus between the falsified record and the accident.

Additionally, the Court will consider the second scenario: whether, as the Government alleges in its sentencing memorandum, Sandhu was suffering from an "accumulation of fatigue" at the time of the accident.[16] If the falsification of the log-

---

**14.** On the limited facts in *Rivalta I*, the Second Circuit held that a departure was inappropriate. However, on remand, the district court found that the defendants had intended or knowingly risked the victim's death, and the Second Circuit affirmed. *United States v. Rivalta (Rivalta II )*, 925 F.2d 596 (2d Cir. 1991).

**15.** The Government argues that even if Sandhu was not in violation of the 10–hour rule at the time of the accident, he would have driven over 10 hours on the date in question if not for the crash. Gov't Mem. at 8. What Sandhu *would have* done is irrelevant. The issue is whether, at the time of the accident,

Sandhu's falsification of the logbook contributed to the fatigue and therefore the accident.

**16.** While a CMV driver who is violating the 10–hour rule can be considered fatigued, it is outside the Court's ability to take judicial notice that a driver might have been suffering from an "accumulation of fatigue" after several days of violating the 10–hour rule. Therefore, expert testimony on this point may be required. *Cf. Purnick v. C.R. England, Inc.*, 269 F.3d 851, 853–54 (7th Cir.2001) (holding that violating the 10–hour rule on several occasions before the accident is not necessarily evidence that the defendant was fatigued at the time of the accident).

books was done to allow Sandhu to circumvent the 10–hour rule on numerous occasions leading up to the accident, and due to these long days of driving Sandhu was suffering from an "accumulation of fatigue" on the day of the accident, the testimony of the alleged eyewitness will be relevant.

Accordingly, under either scenario, the Court may consider the testimony of the eyewitness in determining whether a departure under 5K2.1 is appropriate.

### 2. *Variance under § 3553(a)*

Even if the Court determines that Sandhu was neither in violation of the 10–hour rule at the time of the accident nor suffering from an "accumulation of fatigue" at the time of the accident due to repeated violations of the 10–hour rule prior to the accident, the Court retains significant discretion to increase Defendant's sentence under the calculus mandated by 18 U.S.C. § 3553(a).

■ Congress has charged the Court with imposing a sentence that "reflect[s] the seriousness of the offense ... [and] afford[s] adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(A), (B), amongst the other factors listed in Section II.B, *supra.* The offense charged here— falsification of logbooks in order to circumvent the DOT's safety regulations—is a serious offense that carries risks far greater than those for most document falsifications.

The typical § 1001 case involves an individual whose sole victim is the government: a defendant who lies to the Government in order to make a pecuniary gain. For example, for the defendant who lies on his customs form to avoid paying import duties, or the defendant who lies on an IRS form to avoid paying higher taxes, there is little or no danger of physical harm to others. The greatest evil that will result from the lie is that the Government will lose money.

The 10–hour rule, on the other hand, has a different purpose: promoting safety. Though the hours of service regulations have a somewhat tortured history, the intent of Congress and the DOT is clear: limiting the hours CMV drivers can drive (and requiring them to submit logbooks verifying their hours) improves the safety of our nation's roadways. Circumventing the regulation means risking the safety of innocent motorists.

The 10–hour rule has been in effect, mostly unchanged, since 1941. The Motor Carrier Act of 1935 provides that "[t]he Secretary of Transportation may prescribe requirements for [q]ualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier." 49 U.S.C. § 31502(b). To this end, the Interstate Commerce Commission (ICC), conducted hearings and issued a report supporting its rule limiting motor carriers' hours of service. Ex Parte No. MC–2, *In the Matter of Maximum Hours of Service of Motor Carrier Employees,* 3 M.C.C. 665 (I.C.C. Dec. 29, 1937).

The first ICC rule limited drivers to working a maximum of 12 hours in any 24–hour period. 49 C.F.R. § 191.4 (1938). The original 12–hour requirement was changed to 10 hours in 1941. 49 C.F.R. § 191.3(b) (1941). In 1962, the 24–hour cycle was removed and replaced with a period of off-duty hours. 27 Fed.Reg. 3553 (Apr. 13, 1962).

The Motor Carrier Safety Act of 1984 requires the Secretary of Transportation to "prescribe regulations on commercial motor vehicle safety" to ensure that, inter alia, "the physical condition of operators of commercial motor vehicles is adequate to

enable them to operate the vehicles safely." 49 U.S.C. § 31136(a).

The ICC Termination Act of 1995 requires the Federal Highway Administration to promulgate a rule "dealing with a variety of fatigue-related issues pertaining to commercial motor vehicle safety." 109 Stat. 803 (1995) (codified in scattered sections of 49 U.S.C.).

In 2000, the authority to regulate CMVs was transferred from the FHWA to the Federal Motor Carrier Safety Administration (FMCSA). 42 U.S.C. § 113.

On April 28, 2003, the hour requirements for CMV drivers were changed for *property*-carrying vehicles. 68 Fed.Reg. 22516 (Apr. 28, 2003). The rules remained the same for *passenger*-carrying CMVs. 49 C.F.R. § 395.5(a) (2003). However, the requirements were relaxed for *property*-carrying CMVs: drivers could now drive more than 11 cumulative hours after 10 hours off-duty. 49 C.F.R. § 395.3(a) (2003).

However, in 2004, the D.C. Circuit vacated the FMCSA's new rule for property-carrying vehicles on the grounds that it was arbitrary and capricious because it did not consider the rule's impact on drivers' health. *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209 (D.C.Cir. 2004). In response to the D.C. Circuit's action, Congress, in the Surface Transportation Extension Act of 2004, extended the new hours-of-service regulation until the FMCSA promulgated a new regulation or until September 2005. 108 Pub.L. 310, § 7(f). In August 2005, the FMCSA, after considering the issues required by the D.C. Circuit, promulgated the rule anew. 70 Fed.Reg. 50071 (Aug. 25, 2005).

The ICC wrote in 1937 that "[a] fatigued driver, whether that fatigue results from excessive hours of work or other causes, may become an inattentive, careless, or otherwise unsafe driver. The regulations set out hereinafter are designed to prevent, on the basis of currently available information, the unsafe conditions which are associated with excessive fatigue." 3 M.C.C. at 668. Since 1937, obviously, there have been numerous studies on the connection between hours spent driving and fatigue, and between fatigue and automobile accidents. *See, e.g.,* Deborah M. Freund, Office of Motor Carrier Safety, Publication No. DOT–MC–99–129, *An Annotated Literature Review Relating to Proposed Revisions to the Hours–of–Service Regulation for Commercial Motor Vehicle Drivers* (Nov.1999), *available at* http://dmses.dot.gov/docimages/pdf46/77837_web.pdf (conducting a near-exhaustive literature review); Federal Motor Carrier Safety Administration, U.S. Department of Transportation, *Regulatory Impact Analysis and Small Business Analysis for Hours of Service Options* ch. 8 (2002), *available at* http://dmses.dot.gov/docimages/pdf88/240882_web.pdf (citing dozens of scientific studies in its comprehensive analysis of the connection between "driver fatigue, sleep, and truck-related accidents"); David Polin, *Cause of Action Against Trucker or Truck Driver for Injuries Caused by Driver Fatigue,* 17 Causes of Action 2d 105 (2006) (listing 20 such studies, scientific and otherwise, in the bibliography). The FMCSA undertook a review of the relevant scientific literature and came to the same conclusion the ICC arrived at in the 1930s: after a certain amount of hours spent driving, commercial truck drivers become fatigued and their presence on the road is a significant safety concern. Hours of Service of Drivers, 70 Fed.Reg. 3339 (Jan. 24, 2005).

In a case regarding the DOT's rule for motor carriers' safety fitness ratings, the D.C. Circuit approvingly cited several studies finding that fatigue plays a significant role in truck drivers' accidents. *Am.*

*Trucking Ass'ns v. U.S. Dep't of Transp.,* 166 F.3d 374 (D.C.Cir.1999). Looking at the record in the case, the court noted that one study[17] found that fatigue was the " 'probable primary cause' of 41% of studied accidents, while alcohol impairment was involved in only 4% of studied accidents"; a second study[18] found an "over-risk of involvement in accidents beyond ten and more hours of work span"; and a third study[19] concluded that "accident rates for trucks tend to increase dramatically the longer the driver continues beyond 8 hours of continuous driving." *Id.* at 384–85 (internal quotation marks omitted).

According to the FMCSA, "hours-of-service regulations exist to ensure a safe environment for the CMV driver, and for the driving public that shares the nation's highways." 70 Fed.Reg. at 3343. As the Ninth Circuit stated:

> It is apparent from the nature of [the defendant's] offense itself—creating false logbooks to conceal hours-of-driving violations—that the offense involved the risk of serious bodily injury. The regulations governing the log books and

the hours-of-driving requirements are entitled "Federal Motor Carrier *Safety* Regulations–Hours of Driving Drivers." C.F.R. Title 49, Part 395 (emphasis added). The hours-of-driving limitations are plainly designed to limit driver fatigue and therefore reduce motor carrier accidents. Violations of those regulations therefore create a "risk" of truck accidents and serious bodily injury. Moreover, by concealing the hours-of-driving violations by creating false log books, [the defendant] magnified the risk created by the violations by ensuring that they would continue undetected. *United States v. Johansson,* 249 F.3d 848, 859 (9th Cir.2001).[20] While *Johansson* dealt with sentencing enhancements under the Sentencing Guidelines, it nonetheless reflects the public policy of the statute: protecting public safety.[21]

Therefore, falsifying documents intended to promote safety carries a significant danger of physical harm to others. The regulations at issue here were not designed to put revenue in the Government's coffers; they were designed to protect the

---

**17.** Transportation Research and Marketing, *A Report on the Determination and Evaluation of the Role of Fatigue in Heavy Truck Accidents* 14 (1985).

**18.** Patrick Hamelin, *Surveys about Professional Truck Drivers: Professional Characteristics of Truck Drivers: Situations, Conditions and Duration of Work: Road Safety Effects* 4 (1990).

**19.** NTSB, *Safety Study: Fatigue, Alcohol, Other Drugs, and Medical Factors in Fatal–to–the–Driver Heavy Truck Crashes* 78 (1990).

**20.** *Cf. United States v. McCord, Inc.,* 143 F.3d 1095, 1098 (8th Cir.1998) ("[W]hile hours-of-service regulations are undoubtedly motivated in part by safety concerns, the limitations in the current DOT regulations have been in effect for many decades. The government has not explained their specific relation to fatigue and safe motor vehicle operation.").

**21.** *Burke v. Maassen,* 904 F.2d 178 (3d Cir. 1990), is not the contrary. In *Burke,* the Third Circuit considered the federal regulation and found that a violation of the 10–hour rule does not constitute an action in knowing disregard of public safety. In holding that punitive damages were inappropriate under Pennsylvania law simply because a truck driver violated the 10–hour rule, the court noted that "[t]he ten hour regulation itself ... makes no mention of its purpose to avoid driver fatigue and accidents, nor is this purpose set forth elsewhere in the part containing that regulation." *Id.* at 183. However, *Burke* dealt with a civil action under Pennsylvania law and the mens rea component for punitive damages; the case at hand is a criminal action under federal law in which Defendant's knowledge of purposes of the regulation is irrelevant.

safety of millions of Americans citizens who travel the nation's roadways alongside commercial vehicles.

Enforcement of the 10–hour rule requires truthful and complete self-reporting. Failure to accurately record the time spent driving and off-duty makes enforcement of the federal regulations difficult. Falsifying driving records has a deleterious effect on the safety of our nation's highways. In other words, a violation of the regulation is relevant to sentencing, regardless of whether Defendant was in fact in violation of the 10–hour rule or was "fatigued" at the time of accident.

Here, Sandhu falsified 42 entries in a 2–month span. These repeated and unjustified fabrications bear on the seriousness of the crime and implicate notions of adequate deterrence and protection of the public. *See* 18 U.S.C. 3553(a)(2). Therefore, consideration of the safety purpose of the 10–hour rule is relevant at sentencing.

## III.  NOTICE TO THE PARTIES

Prior to *Booker*, Federal Rule of Criminal Procedure 32(h) required district courts to provide the parties with advance notice of the possibility of a departure from the Sentencing Guidelines range. However, post-*Booker*, a district court can "vary" a sentence upward without necessarily "departing" upward. And the Third Circuit has recently held that when a "variance [i]s based on application of the § 3553(a) factors under *Booker* and not on a departure from the Guidelines," advance notice under Rule 32(h) is not required. *Vampire Nation*, 451 F.3d at 195. Nevertheless, this Memorandum serves as notice to the parties that the Court is contemplating imposing a sentence above the 14–month high end of the Guidelines range, for the reasons stated herein.

## IV.  CONCLUSION

For the reasons set forth above, the Court is permitted to consider evidence of the accident and its consequences, provided that it is otherwise reliable, in imposing a sentence within the Guidelines range, and/or upwardly departing under the Guidelines, and/or applying the § 3553(a) factors, including an (upward) variance.

Therefore, the motion to strike will be denied.

### ORDER

**AND NOW,** this **15th** day of **November 2006,** after considering Defendant's objection to the Presentence Investigation Report, which was construed by the Court as a motion to strike (see doc. no. 28), and the Government's response thereto, and after a hearing on the record on November 2, 2006, it is hereby **ORDERED** that Defendant's motion to strike is **DENIED.**

**AND IT IS SO ORDERED.**